**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

**DONALD EUGENE GARDNER, III,**     :

     **Plaintiff,**     :

**vs.**     :     **CIVIL ACTION 12-281-CG-C**

**COUNTY OF BALDWIN, *et al.*,**     :

     **Defendants.**     :


**REPORT AND RECOMMENDATION**


Plaintiff, a Baldwin County Sheriff's Corrections Center ("BCSCC") inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action was referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the motion for summary judgment of defendants Baldwin County, Alabama, Baldwin County Sheriff Huey "Hoss" Mack, Assistant Chief Deputy of Corrections Dale Byrne, Sergeant Melvin Bradley, Officer Anthony Brown, Officer David Aldrete, Officer John Rowell, Officer Kendrick McNeal, Officer Joshua Keers, and Officer Mark Boyington (Docs. 32, 34, 35, 39, 40, 48); and plaintiff's opposition thereto. (Doc. 45; Doc. 56 Exs. A-I (*see* Doc. 68); Doc. 65). For the reasons stated below, it is recommended that defendants' motion for summary judgment be granted, in part, and denied, in part. It is recommended that the summary judgment motion be granted to the extent that plaintiff's claims for compensatory and punitive damages be dismissed without prejudice pursuant to 42 U.S.C. § 1997e(e), his claim for injunctive relief be dismissed as moot, and his claims

against defendant Baldwin County be dismissed with prejudice as frivolous. It is further recommended that that defendants' affirmative defense of failure to exhaust administrative remedies be denied and plaintiff's claims for nominal damages proceed in this action.

## I. Summary Judgment Standards.

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing [substantive] law." *Id.*; *see Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 998 (11th Cir.), *cert. denied,* 507 U.S. 911 (1993). Moreover, "what is considered to be the 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial, but those are the facts at this stage of the proceeding for summary judgment purposes." *Cottrell v. Caldwell,* 85 F.3d 1480, 1486 (11th Cir. 1996).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52. "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992). The moving party has the burden of

showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the Court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir. 1993); *Tipton,* 965 F.2d at 998–99. In addition to demonstrating that there is no genuine issue of material fact, the movant must also satisfy the ultimate burden of persuasion on the claim by showing that it would be entitled to a directed verdict at trial. *See Fitzpatrick,* 2 F.3d at 1116.

Once the movant satisfies its initial burden under Rule 56(c), the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting FED.R.CIV.P. 56(e)) (emphasis omitted). Although "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson,* 477 U.S. at 255, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587.

Moreover, the non-movant "bears the burden of coming forward with sufficient evidence on each element that must be proved." *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990). If "a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial," Rule 56(c) mandates that summary judgment be entered against that party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## II.  Summary of Factual Allegations.

From its review of the record, the Court summarizes the parties' allegations that are material to the issues addressed in this Report and Recommendation. Plaintiff was booked into the BCSCC on September 7, 2011, was sentenced on April 12, 2012 to four years' imprisonment on a third-degree burglary conviction,[1] and was transferred to the custody of the Alabama Department of Corrections ("ADOC") on May 1, 2012. (Doc. 34-4 at 2-3). While plaintiff was incarcerated at BCSCC, defendants considered plaintiff to be a constant and extreme troublemaker who challenged authority, caused the staff to become angry, and was confrontational, antagonistic, and manipulative. (Docs. 34 -1, -2, -3, -4, -5, -8 at 2-3; Docs. 40-1, -2 at 2-3).[2]

### A.  Incidents of March 10, 2012.[3]

In the complaint, plaintiff identified four claims, which arose on three separate days. (Doc. 1).[4] The Court is addressing the claims in chronological order, which is not

---

[1]  Plaintiff was booked into BCSCC on three charges of third-degree burglary of a non-residence and one charge of second-degree burglary of a non-residence. (Doc. 3-1 at 9-10).

[2]  The Court notes that after filing the present action, plaintiff filed another action, *Gardner v. Baldwin County,* CA 12-639-CG-B (S.D. Ala.) (pending), in which he complains about the handling, or lack thereof, at BCSCC of his long-standing mental health issues.

Plaintiff's mental health issues are also reflected in the documents filed in this action. In the special report, the Court discovered a document that described an incident that occurred on April 26, 2013, after the events complained about in the present action, where plaintiff ran up the stairs in F-block with a sheet around his neck. (Doc. 35-5 at 72). Plaintiff jumped from the second floor, but the sheet tore causing him to land on top of the tables below. (*Id.*). Plaintiff was then taken to North Baldwin Infirmary. (*Id.*).

[3]  In the complaint the incidents on March 10, 2013 serve as the bases for claims 2 and 4. (Doc. 1 at 5-10, 17-19).

the order of presentation in the complaint. When plaintiff was booked into BCSCC, he did not list Emmanuel Jones or Timothy Betts as enemies. (Doc. 34-4 at 8). On March 10, 2012, while housed in E pod, inmate Emmanuel Jones attacked plaintiff and then five minutes later inmate Timothy Betts attacked him. (Doc. 1 at 21). These assaults occurred when plaintiff was housed in the high-max section, which consists of four separate dormitories, housing 130 inmates, who are mostly violent felony offenders. (Doc. 1 at 17). Plaintiff had not previously reported that he felt threatened by any inmate in E pod. (Doc. 34-4 at 8).

"Plaintiff was taken to medical and treated for cuts, bruising, and swelling to his face, hands, and body." (Doc. 1 at 18). Plaintiff and inmate Betts were both found to be at fault and both were placed on disciplinary status. (Doc. 34-4 at 8). (Defendants do not address the assault by inmate Jones.) Plaintiff was then transferred to cell 6 in F-block, which is in the segregated housing unit ("SHU"). (Doc. 1 at 5; Doc. 34-4 at 9).

Defendant Byrne states that each cellblock is assigned an officer ("pod officer") who is responsible for the feeding and the head count of his pod. (Doc. 34-4 at 7). An

---

[4] The complaint is signed under penalty of perjury (Doc. 1 at 20) and is therefore being treated by the Court as a sworn affidavit. *Sammons v. Taylor*, 967 F.2d 1533, 1545 n.5 (11th Cir. 1992). The affidavit of Charles Shaver, however, is not being considered because it is not properly attested. (Doc. 65 at 70). Document 45 filed by plaintiff states in the certificate of service that he "sent a copy of most of the same document to . . . counsel for defendants." (Doc. 45 at 4). There is no indication as to which documents were sent. Then, in plaintiff's first amended complaint, he stated in the certificate of service that he is "without means to make copies of these documents to send to defendants' attorney or mail them." (Doc. 56-1 at 6). Plaintiff's first amended complaint was denied (Doc. 61), but the documents attached to the amended complaint were allowed for the purpose of supporting plaintiff's complaint. (Doc. 68). Lastly, plaintiff's traverse to defendants' special report (Doc. 65) is not sworn, nor is an affidavit from plaintiff attached. Plaintiff, however, does attach affidavits of other inmates. In the certificate of service, he again states that he sent most of the documents to counsel for defendants (Doc. 65 at 55), and it appears that the text of his traverse was sent to counsel for defendants. (*Id.* at 52).

officer is stationed in the control pod, which has large glass windows for its walls so the dayrooms and cells are clearly visible to the officer. (Doc. 34-4 at 7). In addition, seven to eight other officers ("alternates") are stationed throughout BCSCC and go wherever they are needed. (Doc. 34-4 at 7).

On the same day, after plaintiff had been moved to F-block, Corporal Pettway told defendant Brown that plaintiff had asked to be moved to another cell so he could be housed with a friend. (Doc. 34-3 at 3). But Pettway denied the request because it was not a valid reason and warned defendant Brown that plaintiff would try to get moved. (*Id.*). At approximately 1:45 p.m., plaintiff used the intercom to call the control room where defendant Brown was stationed and told defendant Brown that he and his cellmate were not getting along. (*Id.*). Defendant Brown told plaintiff that he would not be moved and then left on the speaker, which let defendant Brown hear plaintiff tell his cellmate that he would be moved one way or another and for the cellmate to tell officials that they were not getting along. (*Id.*). He told Pettway, John Doe, and defendant Brown that he feared a confrontation with or an assault by his cellmate. (Doc. 1 at 5).

Inmate Jesse Dixon states in a sworn affidavit that at some point time he was a cellmate of plaintiff's cellmate in F-block, and plaintiff's cellmate told inmate Dixon that he had been to Searcy Hospital and needed medication. (Doc. 45 at 6). Inmate Dixon considered him to be a "lunatic" because he would talk to himself, spit everywhere, and laugh hysterically for no reason. (Doc. 45 at 6). Furthermore, he, a black maie, told inmate Dixon that "he did not like cracker's (white people at all)." (*Id.*).

Defendant Brown told plaintiff that he did not believe plaintiff's statements were true and would not move plaintiff, and that he would check on plaintiff later to be sure

that plaintiff was okay. (Doc. 1 at 5). In an attempt to notify another person of his fears, plaintiff started pressing the panic button. (*Id.* at 6). After the panic button was pressed numerous times by plaintiff, defendant Brown warned plaintiff that if he pressed the button one more time that he would receive a disciplinary action. (*Id.*). Then, plaintiff began banging and kicking his door to get the attention of the officers who were walking by his cell door. (*Id.*). Defendant Brown told plaintiff to stop, but plaintiff refused. (Doc. 34-3 at 4). Defendant Brown told plaintiff that if he did not stop kicking his door, he would be sprayed. (Doc. 1 at 6). Plaintiff's cellmate began to yell at plaintiff, and then he laughed hysterically. (*Id.*). "Out of fear and the threat of violence, plaintiff continued kicking and banging on the door for help." (*Id.*).

Defendant Brown called Sergeant Means and apprised him of plaintiff's actions. (Doc. 34-3 at 4). Sergeant Means "instructed [defendant Brown] to call other officers to F-block and authorized defendant Brown to administer pepper spray and use the restraint chair if Plaintiff refused to follow orders to stop his disruptive actions." (*Id.*). When plaintiff continued creating a disturbance and a security issue by kicking his cell door, defendant Brown called a code yellow which caused multiple corrections officers to assist in subduing plaintiff. (*Id.*). Defendant Brown and other officers warned plaintiff that if he did not stop kicking, he would be sprayed and placed in the restraint chair. (*Id.*). Plaintiff continued to kick, and then was warned several more times. (*Id.*). Defendant Brown armed with a canister of pepper gas entered SHU along with Officer Arnold and Corporal Sanders, who had a camera to record the incident. (Doc. 1 at 6-7). Plaintiff ceased banging and kicking the door and kneeled with his hands behind his head, yelling, "I am not resisting." (*Id.* at 7). His cell door was opened and defendant

Brown sprayed plaintiff in his mouth causing him to experience pain and a burning sensation in his eyes, loss of vision, disorientation, and trouble breathing. (*Id.*). Whereas, defendant Brown maintains that because plaintiff refused to obey orders, defendant Brown gave one, one-second spray of pepper spray toward plaintiff who was approximately four feet away from him. (Doc. 34-3 at 4; Doc. 35-5 at 7).[5] Immediately, after the spraying plaintiff was compliant. (Doc. 34-3 at 4).

Defendant Brown relates that the incident occurred very close to 2:00 p.m., when the shifts changes, which requires that all inmates be in lockdown or in a restraint chair, except for an emergency situation. (*Id.* at 4-5; *see* Doc. 34-1 at 3-4 & Doc. 34-7 at 6, indicating this is standard operation). Plaintiff was then forcibly handcuffed and made to stand by the pod where the officers worked. (Doc. 1 at 8). Defendant Brown then shoved plaintiff's head into the wall twice (Doc. 1 at 8), which defendant Brown denies. (Doc. 34-3 at 5). However, in a statement made under penalty of perjury, inmate Aaron Cart relates that after plaintiff was taken outside of the dorm, and was standing by the officers' station next to defendant Brown, defendant "Brown while holding [plaintiff's] arm shoved him at the wall and [plaintiff's] head hit the wall. [Plaintiff] looked like he was angry and tried to pull away from Officer Brown and then Officer Brown took his hand and pushed his head into the wall." (Doc. 56-1 at 23).

Because defendant Brown had to work later to complete the resulting paperwork, he told plaintiff that he could not rinse off until the paperwork was completed and the shift changed. (Doc. 1 at 8). Plaintiff was placed in the restraint chair for several

---

[5]   In his unsworn traverse (Doc. 65), plaintiff disputes defendant Brown's version and states that he was less that two feet away from defendant Brown, more or less at point blank range, when he was sprayed for more than one second. (*Id.* at 15).

minutes until the new shift could be debriefed on what transpired during the prior shift. (Doc. 34-3 at 5; Doc. 1 at 8). After the debriefing concluded, plaintiff was washed off in the decontamination room, given a clean uniform, and placed back in the restraint chair. (Doc. 34-3 at 5; Doc. 1 at 8). Plaintiff alleges that he was restrained for seven to eight hours "with a head injury and dizziness" and with pain in his head and eyes. (Doc. 1 at 8-9).

The medical staff checked the straps after plaintiff was strapped in the chair. (Doc. 34-3 at 5). Plaintiff then said, "That was nothing." (*Id.*). When an officer told plaintiff that he would be returned to cell F-6, he said, "No; no I ain't." (*Id.*). Defendant Brown stated that plaintiff was not injured nor harassed in this incident; the force used to put plaintiff in the restraint chair was not unusual; and the action taken against plaintiff was not a form of punishment. (*Id.*). Defendant Brown further stated that plaintiff did not urinate on himself (*id.* at 6); however, plaintiff did not allege that he urinated on himself with respect to this incident.

Inmate Cart stated that he observed plaintiff in the restraint chair until the midnight shift came. (Doc. 56-1 at 23). The next day plaintiff told him that that he never wanted to be sprayed again because it hurts really bad, makes you go blind, and causes your entire body to feel like it is burning, which is repeated, but worse, when the spray is rinsed off. (*Id.*). Plaintiff also told him that they did not let him shower to rinse off, nor did they give him clean clothes. (*Id.*).

The restraint chair is used when an inmate threatens physical harm to himself, the staff, or another inmate, never as punishment, which includes plaintiff's situation. (Doc. 34-3 at 6; *see* Deft. Mack's aff., Doc. 40 at 5-6, describing the restraint chair policy). An

inmate in the restraint chair is released periodically to use the bathroom every two to four hours and to stretch his body every hour and a half to two hours. (Doc. 34-3 at 5). On the average an inmate will be in the restraint chair six to eight hours and will be released at the shift supervisor's discretion to return to his cell. (*Id.*). Restraint chairs are placed in a hall next to the central control room, which is a heavily traveled area by jail staff and places an inmate under almost constant supervision of members of the jail staff. (*Id.* at 6).

Plaintiff claims that one officer monitors this entire section without the assistance of cameras. (Doc. 1 at 17). Whereas, defendant Bryne states that there are "[a]pproximately 92 mounted video cameras . . . placed throughout the Corrections Center, and we are in the process of installing 23 additional cameras. The vast majority of the jail is visible through a video security camera. A camera is present in each cell block." (Doc. 34-4 at 7-8). Plaintiff contends defendants Mack and Byrne are responsible for the assault on plaintiff due to their "unconstitutional policies and/or practices of not installing cameras and for failing to adequately train, hire, or staff enough officers to work in a maximum security area[.]" (Doc. 1 at 18-19). Plaintiff asserts that he would not have been attacked if an officer or cameras had been present as each would have been a deterrent. (Doc. 1 at 19). Plaintiff maintains that he was not a threat to security or a danger to officers, and was therefore unduly punished as a pretrial detainee. (Doc. 1 at 9).

Plaintiff received a disciplinary for harassing defendant Brown and the staff by pressing the button numerous times. (Doc. 1 at 9). And plaintiff's cellmate was moved to another cell as Sergeant Jane Doe agreed that they needed to be separated. (Doc. 1 at

9).  Furthermore, plaintiff submitted a grievance to internal affairs and the sheriff over this incident. (Doc. 1 at 9; Doc. 45 at 13, grievance dated March 13, 2012, complaining about the assault by inmates Betts and Jones with its response dated March 21, 2012 by Investigator Griffin and defendant Byrne; Doc. 45 at 14, grievance dated March 10, 2012 complaining about not receiving responses to several grievances concerning a variety of matters, one being the behavior of defendant Brown, with a response from defendant Byrne dated March 21, 2012, stating he did not have the address of the county attorney).

### B.  Incident of March 25, 2012.[6]

On March 25, 2012, an inmate in F-block was being combative, unruly and refusing to obey orders so defendant Bradley retrieved the FN303 pepper spray gun in case pepper spray was needed to control the inmate.  (Doc. 34-2 at 3).  The pepper spray gun was not used as the inmate complied with orders and stopped resisting.  (*Id.*).  As defendant Bradley was leaving F-block (plaintiff was housed in cell F-4), he attempted to release air pressure in the line by pointing the gun to the floor, and instead a pepper-spray projectile ball was discharged onto the floor next to the door exiting the block.  (*Id.*).  All inmates in the block were in their cells with the doors secured when this occurred.  (*Id.*).  No inmate including plaintiff appeared to be suffering any ill effects from the pepper spray at that time.  (*Id.* at 3-4).

Plaintiff, however, contends that he was taking a shower when defendant Bradley intentionally fired his rifle several times, pointing it downward, to "clear the air pressure out of the line."  (Doc. 1 at 3).  Plaintiff disputes the effects of the pepper spray stating that he suffered a temporary loss of vision, extreme burning of his eyes, fits of coughing,

---

[6]  In the complaint, this incident serves as the basis for claim 1.  (Doc. 1 at 2-5).

a burning and irritated throat, an inability to breathe, and pain when trying to breathe. (*Id.* at 3-4). To support his position, plaintiff offers the sworn affidavit of inmate Jesse Dixon who states that he was returning from the medical unit and upon entering F-dorm, he began to cough and struggled to breathe because the chemical from defendant Bradley's pepper gas rifle was "so overpoweringly strong [that] it hurt him." (Doc. 56-1 at 18). He witnessed plaintiff and his cellmate, who were out of their cells, yelling at defendant Bradley to turn off the exhaust fans. (*Id.*) Plaintiff appeared to be wet and they were both complaining and coughing. (*Id.*)

Defendant Bradley states that pepper spray splattered on his arms and face, on the officers behind him, and on the floor near the exterior door. (Doc. 34-2 at 3). Plaintiff's cell was approximately twelve feet away from where the pepper spray landed. (*Id.*). Defendant Bradley returned to the block with a mop and soap, and thoroughly cleaned the floor. (*Id.*). At that time, according to defendant Bradley, plaintiff made no comment about the pepper spray or suffering any physical effects from it, nor did he request medical care after it was discharged or after the floor was cleaned. (*Id.* at 3-4).

Inmates housed in F-block are in disciplinary status or protective custody, or require medical care. (*Id.* at 4). The cells have a plastic shield over a grated window to prevent items from being thrown at an officer or another inmate. (*Id.* at 5). The shield would have prevented the pepper spray from entering plaintiff's cell. (*Id*).

Prior to the incident defendant Bradley had not experienced a pepper spray ball discharge when he released air pressure from the line. (*Id.*). "The release of the one pepper spray ball was unintentional and was not done as a way to harass Plaintiff[,]" and was reported to defendant Bennett. (*Id.*). Defendant Bradley did not interact with

plaintiff at the time of the incident. (*Id.*). This statement is consistent with plaintiff's allegations that defendant Bradley did not attempt to alleviate plaintiff's suffering or pain or offer an apology. (Doc. 1 at 4). At the time of the incident, there was no policy in effect prohibiting the release of air pressure from an FN303 in a cellblock. (Doc. 34-2 at 5). Since the incident a policy has been instituted requiring that the air pressure be released outside of BCSCC. (*Id.*).

Plaintiff claims that defendant Bradley discharged his gun to harass and hurt him and in retaliation for plaintiff filing an unspecified grievance. (Doc. 1 at 9). Plaintiff filed a grievance over this incident and received a response from Staff Sergeant Anderson admitting that defendant Bradley had fired his weapon inside SHU. (*Id.*; *see* Doc. 35-3 at 4, grievance dated 3/25/12, responded to by defendant Byrne).

**C. Incident of April 13, 2012.[7]**

On April 13, 2012, after turning a weapon over to officers, inmate Brent Jacoby was placed in plaintiff's cell in SHU. (Doc. 1 at 11). At approximately 1:45 p.m., inmate Jacoby began to kick and bang on the door after he had repeatedly pressed the panic button to talk to a supervisor because his periodicals, hygiene products, pens, food, drawings, and legal materials were missing. (*Id.*; Doc. 34-1 at 3). Five minutes later, defendants Keers, Rowell, and Boyington opened the cell door, and defendant Keers entered ordering Jacoby to get on the ground. (*Id.*). Immediately after the order was given, defendant Rowell entered and began spraying Jacoby and plaintiff with pepper spray. (Doc. 1 at 12). These officers did not let plaintiff leave the cell. (*Id.*). Inmate Brent Jacoby, in a sworn affidavit, supports plaintiff's allegations that defendant Rowell

---

[7] In the complaint the incident of this date serves as the basis for claim 3. (Doc. 1 at 11-17).

sprayed plaintiff, which caused him to "appear to be in pain and complain of coughing and burning eyes as well as trouble breathing."  (Doc. 45 at 4).[8]

Contrary to plaintiff's statement that both Jacoby and he were sprayed, defendants Aldrete, Keers, and Rowell state that "[t]he pepper spray was sprayed directly at Jacoby and did not reach the Plaintiff."  (Doc. 34-1 at 3; Doc. 34-5 at 3; Doc. 34-8 at 3). Defendants Rowell and Keers further state that when the pepper spray was administered, "plaintiff had a towel and a sheet over his head and was in the corner of the cell[,]" "approximately 5 to 6 feet away from Jacoby[.]"  (Doc. 34-5 at 3; Doc. 34-8 at 3). Plaintiff states that "he did not have a towel and sheet on him. . . , but did have a T-shirt tied around his face and that this is totally distinguishable by looking at the video. . . ." (Doc. 65 at 23).[9]  If the pepper spray had reached plaintiff, defendant Rowell said that it would have reached him and the officers as well.  (Doc. 34-8 at 3).  As it was, the officers who were present, including defendant Rowell, suffered no effects from the pepper spray. (*Id.*).  After inmate Jacoby was handcuffed, plaintiff was allowed to leave and go to the dayroom.  (Doc. 34-1 at 3; Doc. 34-5 at 3; Doc. 34-8 at 3).  At that time, plaintiff did not appear to be suffering from the effects of the pepper spray, that is, he was not choking, coughing, or having trouble breathing, although he complained about the pepper spray in his cell.  *Id.*  Thus, he was given a mop and mop bucket containing a cleaning solution in order to remove any pepper spray that may have fallen on the floor.  *Id.*  Because plaintiff

---

[8]   The Court observes that inmate Jacoby filed four actions with this Court while incarcerated at BCSCC, namely, *Jacoby v. Baldwin County,* CA 12-197-WS-M (S.D. Ala. May 22, 2013) (Jacoby is appealing the summary judgment dismissal for defendants of his action concerning his mental health issues); *Jacoby v. Baldwin County,* CA 12-366-CG-C (pending); *Jacoby v. Baldwin County,* CA 12-640-CG-N (pending); and *Jacoby v. Mack,* CA 13-70-KD-B (pending).

[9]   Document 65 is not a sworn statement.

complained about pepper spray being on his bedding, defendant Aldrete instructed plaintiff to put anything that needed replacing outside of the cell so he could get replacements. (Doc. 34-1 at 3). Plaintiff did not put anything outside of his cell. (*Id.*).

On the other hand, plaintiff maintains that after Jacoby was removed from the cell, he asked defendant Keers and Boyington for a change of clothes and bedding, cleaning supplies to the clean the cell, and a shower. (Doc. 1 at 12). His requests were denied, and defendant Aldrette told him to lockdown in the contaminated cell. (*Id.*). Because the spray was so strong, he "started choking, coughing, struggling to breath and began itching and burning worse than he already was[,]" and was unable to stay in the cell. (*Id.*). Plaintiff pleaded with defendants Aldrete and McNeal to let him lockdown in another cell but was told that force would be used if he refused to lockdown in his cell. (*Id.* at 13).

At 2 p.m., when the shift changes, defendant Aldrete ordered plaintiff to return to his cell for lockdown. (Doc. 34-1 at 3; Doc. 40-2 at 3; Doc. 34-8 at 3). Defendants McNeal and Aldrete, who were in the control pod, instructed plaintiff several times to lockdown, but he refused each time. (Doc. 34-1 at 3; Doc. 40-2 at 3; Doc. 34-8 at 4; Doc. 1 at 12-13). Plaintiff cursed, screamed, and yelled that he would not lockdown even though defendant Aldrete reiterated to plaintiff that he would be provided clean bedding, towels, and a uniform after lockdown. (Doc. 1 at 13; Doc. 34-1 at 4; Doc. 40-2 at 3). Due to plaintiff's unrelenting behavior, defendant Aldrete called Sergeant Graves who told him to call a code yellow, which caused all available officers to come to F-block. (Doc. 34-1 at 4; Doc. 40-2 at 3; Doc. 34-8 at 4). Thirteen officers came from both of the shifts to the dayroom where plaintiff was standing with a sheet or towel over his head and

not demonstrating any ill effects from the pepper spray. (Doc. 34-1 at 4; Doc. 34-8 at 4). When the officers approached the dayroom door, plaintiff picked up the mop bucket and threw water across that dayroom floor. (Doc. 34-1 at 1; Doc. 40-2 at 4; Doc. 34-8 at 4). After another officer replaced him in the pod, defendant Aldrete left and headed to dayroom. (Doc. 34-1 at 5). Plaintiff, who was holding the mop like a weapon, announced he was not going back onto his cell and the officers were going to have to come get him. (Doc. 34-1 at 5; Doc. 34-8 at 4). Plaintiff was repeatedly told to lie down on the floor, which he refused to do. (Doc. 34-1 at 5; Doc. 40-2 at 4; Doc. 34-8 at 4-5). Sergeant Graves, armed with the pepper ball gun, entered the dayroom with multiple officers following him. (Doc. 34-1 at 5; Doc. 34-7 at 4). At that time, plaintiff lay down in the doorway of his cell. (Doc. 34-1 at 5; Doc. 40-2 at 4; Doc. 34-8 at 5). Plaintiff complied with the instructions so he could be handcuffed. (Doc. 34-1 at 5, Doc. 34-8 at 5). Because plaintiff complied with the order and did not resist, pepper spray was not used. (Doc. 34-1 at 5).

Plaintiff told defendant McNeal, "I am suing you." (Doc. 40-2 at 4). Defendant McNeal along with other officers entered plaintiff's cell and noted that the cell did not smell like pepper spray, which it would have if pepper spray were present on bedding or towels. (*Id.*).

Plaintiff complained of having insufficient time to clean his cell and to remove the contaminated items even though he had been given fifteen minutes to do so, time which he spent arguing and complaining. (Doc. 34-1 at 6; Doc. 40-2 at 5; Doc. 34-8 at 6). He resisted being escorted, yelled profanities, and resisted being secured in the restraint chair. (Doc. 34-1 at 5; Doc. 34-8 at 5; Doc. 40-2 at 5). Plaintiff was held at rifle

point and was surrounded by ten to fifteen officers who forced him into a restraint chair. (Doc. 1 at 13). Plaintiff claims that defendants Aldrette and McNeal did not allow him to rinse his eyes or face or change his clothes, nor did the medical staff treat him for his burning skin and eyes. (*Id.*). Medical personnel checked the straps of the restraint chair to ensure their tension was safe. (Doc. 34-1 at 6; Doc. 40-2 at 5). During the exam, plaintiff continued to be belligerent. (Doc. 34-1 at 6; Doc. 34-8 at 6). At that time and afterwards, plaintiff did not appear to be suffering any effects from the pepper spray. (*Id.*). Despite his pleas to be allowed to decontaminate himself and to use the bathroom, plaintiff claims that he was left in the restraint chair in his mace-covered clothes for eight hours, during which he urinated on himself. (Doc. 1 at 13).

According to defendants, after plaintiff was restrained, he continued to yell profanities and complained about pepper spray on his bedding and mat. (Doc. 34-1 at 6; Doc. 40-2 at 5). He made no complaint that the pepper spray was on him and did not appear to be suffering from the effects of pepper spray. (*Id.*). During his time in the restraint chair, plaintiff did not appear to have urinated on himself and, if he did, defendants Aldrete and Rowell have no doubt that he would have been continuously yelling about it. (Doc. 34-1 at 7; Doc. 40-2 at 6). Whereas, inmate Jacoby in his sworn affidavit states that he saw plaintiff being placed in the restraint chair and that plaintiff and he were not permitted to use the bathroom for four hours resulting in them urinating on themselves, nor could they rinse off their skin and clothes until about eight hours later. (Doc. 45 at 4-5).

On April 15, 2012, plaintiff filed a grievance based on the April 13, 2012 incident concerning the spraying of pepper spray in Jacoby's and his cell. (Doc. 56-1 at 20). In it

plaintiff requested the jail to fix its policy when it needs to secure only one inmate in a two-man cell and of placing an inmate in a contaminated cell. (*Id.*). He stated that the spray caused his eyes and skin to burn, restricted his breathing, and caused coughing fits. (*Id.*). On April 17, 2012, defendant Byrne responded that he understood that plaintiff had not been sprayed and had refused to obey directions, resulting in a code being called and plaintiff being put in the restraint chair. (*Id.*).

Plaintiff maintains that the chair is used to restrain violent, aggressive, unruly, or suicidal inmates, not "non-violent maced inmates." (Doc. 1 at 14). Defendants Mack, Byrne, and Baldwin County are alleged to have an inadequate policy or custom that allowed mace to be sprayed in the cell of an unruly inmate when plaintiff was still in the cell and to be placed in the restraint chair for punitive reasons which serves no peneological goals. (*Id.* at 15-17). Defendants Aldrette, Rowell, McNeal, Keers, and Boyington are alleged to have used excessive force on plaintiff and to have forced him into the restraint chair for punitive reasons outside of the disciplinary guidelines and for no peneological reason. (*Id.* at 15-16).

### D. Grievance Procedure.

According to defendants, BCSCC has a grievance process for inmate complaints. (Doc. 40-1). Defendants attached to their special report a copy of the grievance section of the Inmate Handbook for the Baldwin County Sheriff's Corrections Center dated May 15, 2012. (Doc. 35-2 at 2-3). Plaintiff points out in his unsworn statement that this policy was not in effect when the incidents took place in March and April, 2012. (Doc. 65 at 4).

In describing the policy that was attached to the special report, defendant Mack stated that when an inmate is booked, he receives a copy of the Inmate Handbook explaining the grievance policy and procedures. (Doc. 40-1 at 4). Inmates receive grievance forms on which they are required to write the grievance. (*Id.* at 3). An inmate must give the completed form to an appropriate staff member at the lowest level of command within five days of the incident. (*Id.*). Within five working days of the grievance's receipt, the grievance will be investigated and answered. (*Id.*). If an inmate is not satisfied with the response, the inmate may appeal the response through the chain of command, with defendant Mack, the sheriff, being the final decision maker. (*Id.*). The sheriff receives directly grievances that are marked for him. (*Id.*).

Defendant Mack states that he received a written communication from plaintiff on April 13, 2012. (*Id.* at 5). In response, defendant Mack had Sergeant Lawrence Griffith investigate the allegations, which he found to be without support. (*Id.*). On April 18, 2012, Sergeant Griffith, defendant Byrne, Captain Jimmy Bennett, and Director of Nursing Carla Wasdin met with plaintiff regarding the allegations and they found that no policy or procedure of the BCSCC was violated. (*Id.*).

With respect to other claims, defendant Mack states that he did not receive a grievance or other communication concerning the allegations that he or defendant Byrne instituted unconstitutional policies; Baldwin County is responsible for the policies implemented by defendant Byrne and him; defendants Keers, Rowell, Boyington, Aldrete, and McNeal violated his constitutional rights on April 13, 2012; or that plaintiff was forced to urinate on himself while in the restraint chair. (*Id.* at 4). Nor has defendant Mack received a grievance from plaintiff regarding the foregoing allegations. (*Id.*).

Moreover, plaintiff's file at the jail does not contain a grievance or communication about the foregoing allegations. (*Id.*). Therefore, defendant Mack maintains that plaintiff failed to comply with the BCSCC grievance procedure with respect to these allegations. (*Id.*). Whereas, plaintiff counters that the grievance policy that was in effect when he was there, did not require that he detail a violation of policy or procedure or to even name Mack or Byrne in the grievance. (Doc. 65 at 4).

### E. Relief Requested by Plaintiff.

For relief, plaintiff seeks "injunctive relief against Baldwin County Corrections Center" and "compensatory, punitive, and nominal damages against all said defendants" for "the loss of life, liberty, and property [and] pain and suffering, emotional distress, anxiety, bruises, scratches, cuts, and swelling, and loss of sight temporarily." (Doc. 1 at 20).

## III. Analysis.

### A. Application of 42 U.S.C. § 1997e(e).

#### 1. The Statute.

Defendants raise in their special report that plaintiff's claims are barred by 42 U.S.C. § 1997e(e) because he did not suffer a physical injury that was greater than *de minimis* connected to the allegations in his complaint. (Doc. 34 at 36). Section 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

For the purposes of this section, a prisoner is defined as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated

delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997(h). Plaintiff identifies himself as a pretrial detainee when his claims arose, and his pleadings indicate that when he filed this action, he was incarcerated at BCSCC. (Doc. 1). Thus, the Court concludes that § 1997e(e) applies to this action.

Congress enacted this section "[i]n an effort to stem the flood of prisoner lawsuits in federal court[.]" *Harris v. Garner*, 216 F.3d 970, 971 (11th Cir.), *cert. denied*, 532 U.S. 1065 (2001). This section is "[r]ead as a limitation on recovery only[.]" *Harris v. Garner*, 190 F.3d 1279, 1288 (11th Cir. 1999) (finding that the Constitution does not "mandate[ ] a tort damages remedy for every claimed constitutional violation"), *opinion vacated by* 197 F.3d 1059, *opinion reinstated in part by* 216 F.3d 970 (11th Cir.), *cert. denied,* 532 U.S. 1065 (2001). By enacting this section, Congress chose to "preclude[ ] some actions for money damages[,]" *id.* at 1283, and "to enforce prisoners' constitutional rights through suits for declaratory and injunctive relief[.]" *Id.* at 1289.

Section 1997e(e) applies "only to lawsuits involving (1) Federal civil actions (2) brought by a prisoner (3) for mental or emotional injury (4) suffered while in custody." *Napier v. Preslicka*, 314 F.3d 528, 532 (11th Cir.), *cert. denied,* 540 U.S. 1112 (2004). All claims, including constitutional claims, are encompassed by the statute's clear and broad language, with no exceptions being provided. *Al-Amin v. Smith*, 637 F.3d 1192, 1197 (11th Cir. 2011). Moreover, no distinction is made between "constitutional claims frequently accompanied by physical injury (e.g., Eighth Amendment violations) and those rarely accompanied by physical injury (e.g., First Amendment violations)[;]" all constitutional claims are treated equally. *Id.* "In order to avoid dismissal under §

1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than *de minimis*." *Mitchell v. Brown & Williamson Tobacco Corp.,* 294 F.3d 1309, 1312-13 (11th Cir. 2002).

Reviewing plaintiff's allegations, the Court finds that plaintiff complains about the following physical conditions: pain and burning in his eyes from pepper spray sprayed at him or in the vicinity of him, temporary loss of vision, difficulty breathing and pain in breathing, fits of coughing, choking, a burning and irritated throat, disorientation, dizziness, pain in his head, his head being shoved twice into the wall, itchy and burning skin, cuts, bruising, and swelling to his face, hands, and body. Defendants in their affidavits identify pepper spray as the chemical used in three complained of incidents. (Doc. 34-3 at 4; Doc. 34-1 at 3; Doc. 34-2 at 3; Doc. 35-5 at 7 (OC spray)). In one of these incidents the use of pepper spray was directed to plaintiff for his disobedient conduct. (Doc. 1 at 7).

"Pepper spray is 'designed to disable a suspect,' . . . , by causing 'intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx,'. . . . It sometimes also causes 'disorientation, anxiety, and panic' in the person sprayed. . . . That is how it achieves its purpose." *Danley v. Allen,* 540 F.3d 1298, 1309 (11th Cir. 2008) (citations omitted), *overruled on other grounds by Randall v. Scott,* 610 F.3d 701 (11th Cir. 2010). "[P]epper spray is generally of limited intrusiveness,' and it is 'designed to disable a suspect without causing permanent physical injury.'" *Vinyard v. Wilson,* 311 F.3d 1340, 1348 (11th Cir. 2002) ("pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee"); *see Warren v. Perkins,* CA No. 2:09-0522-KD-C,

2009 WL 2882139, at *13  (S.D. Ala. Sept. 1, 2009) ("By using pepper spray, Officer Perkins avoided the use of physical force by himself and possibly other officers against Plaintiff and even potentially other inmates in the dormitory to stop the disruptive behavior, thereby tempering the severity of the forceful response").  Except for the two shoves of his head to a wall and the scrapes caused by other inmates, the physical symptoms that plaintiff complains about are the result of pepper spray being deployed at him or in the vicinity of him.

### 2.  Incidents of March 10, 2012.

### a.  First Incident.

With respect to the first incident of March 10, 2012, plaintiff sustained cuts, bruising, and swelling to his face, hands, and body from assaults by two inmates.  (Doc. 1 at 18).  Plaintiff offers no details about these injuries, which he presented in a general manner, but for the fact that medical personnel treated him.  (Doc. 1 at 18).  Shortly after treatment, on that same day, he was transferred to F-block.  (Doc. 1 at 5).  Plaintiff attributes his injuries to defendants Mack's and Byrne's failure to protect him by not having more officers and cameras present.  (Doc. 1 at 18).   No specific information describing these injuries or how medical personnel treated them was provided.  No medical records were included.  Nor was information given regarding the duration and severity of the injuries.

In the absence of specific information concerning these injuries and of any medical records, these physical injuries appear not to be greater than *de minimis.  See Mann v. McNeil*, 360 F. App'x 31, 32 (11th Cir. 2010) (unpublished) (ruling that "under our case law, the injuries that Mann complains of - including the vague injuries to his

back, the scrapes and marks on his knees and legs, the lack of personal items, the lapse of time in reordering medication, the window-cleaning assignment, and the discontinuance of his pass for showers twice a day - amount to *de minimis* physical injuries[,]" thereby barring Mann's claims for mental anguish and suffering),[10] *cert. denied,* 131 S.Ct. 517 (2010); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) (finding a sore, bruised ear lasting for three days was a *de minimis* injury). Thus, plaintiff's claim for compensatory and punitive damages arising from this incident is barred by 42 U.S.C. § 1997e(e).

### b. Second Incident.

The second incident of March 10, 2012 concerns defendant Brown spraying plaintiff with one spray of pepper spray for about one second. (Doc. 34-3 at 4). Construing the allegations favorably for plaintiff, plaintiff states that he was sprayed in mouth. (Doc. 1 at 7-8). Plaintiff was removed from the cell and had to wait by the officers' station in the restraint chair, according to plaintiff, until defendant Brown completed the resulting paperwork. (*Id.* at 8; Doc. 56-1 at 23). Plaintiff was decontaminated after the shift changed (Doc. 1 at 8), which occurred at 2 p.m., with the incident having occurred at 1:45 p.m. (Doc. 34-3 at 3-4). After plaintiff was decontaminated and was changed into a clean uniform,[11] he was placed in the restraint chair in the hallway next to the pod office for seven to eight hours. (Doc. 1 at 9; Doc. 34-

---

[10] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11TH CIR. R. 36-2 (2005).

[11] In an unsworn statement plaintiff states that he was allowed to use a rubber hose which has been lying on the floor to wash his eyes over a dirty mop sink, which he did not consider decontamination. (Doc. 65 at 15). And plaintiff states that they did not let him shower or receive clean clothes. (*Id.* at 67-68).

3 at 5-6). The medical staff then checked the chair's straps. (Doc. 34-4 at 5). In connection with this incident, plaintiff suffered "pain in his head and eyes" (Doc. 1 at 8), a "head injury and dizziness," (*id.* at 9), and a burning sensation in his eyes, loss of vision, disorientation, and trouble breathing. (*Id.* at 7).

The injuries that plaintiff suffered connected to this incident are not physical injuries that are greater than *de minimis*. Plaintiff's description of his physical injuries is very general and does not show that the injuries were of a long duration or that they were permanent. Plaintiff does not mention that he requested medical care or that when the medical personnel inspected the tension of the chair's straps, the personnel noted a physical injury that needed immediate attention. Nor does plaintiff state that at a later date he requested medical attention for these conditions. Thus, plaintiff's injuries appear to be the typical physical response to being sprayed with pepper spray. Plaintiff's responses to the spray indicate that he was uncomfortable but do not convey that he suffered any injury that was more than *de minimis. See Thompson v. Quinn*, 2013 WL 2151715, at *12 (N.D. Fla. May 16, 2013) (unpublished) (finding that the inmate's claims for the burning sensation on his body from being sprayed with a chemical agent for his kicking his cell door and yelling obscenities was not an injury that was greater than *de minimis* inasmuch as after he rinsed off, he presented no injuries requiring treatment, voiced no complaints in the medical examination, and did not use sick call for later developing problems); *Thompson v. Crews,* 2013 WL 771843, at *2 (N.D. Fla. Feb. 8, 2013) (unpublished) (finding the plaintiff's "allegation of an improper diet, resulting in high blood sugar, fainting, headaches, cold sweats, dizziness, weakness, left arm numbness, weight loss, and other symptoms, is insufficient to establish that plaintiff

suffered more than a *de minimis* physical injury"); *Honors v. Judd*, 2011 WL 3498287, at *1, *7 (M.D. Fla. Aug. 10, 2011) (unpublished) (finding the pretrial detainee's complaints of being thrown into cell wall face first and of having a burning face and eyes, a headache, eye irritation, loss of some vision and eye control, scarring around area around eye, which are the typical results from exposure to Freeze+P2K3, do not reflect an injury that is great than *de minimis*, as the medical records were not produced to substantiate any continuing effects from the chemical agent); *Robinson v. Tift,* 2012 WL 2675467, at *2 (N.D. Fla. June 1, 2012) (finding that the chemical spray did not cause a physical injury that was greater than *de minimis* when plaintiff's eyes involuntarily closed, had a burning sensation, and sustained a temporary loss vision); *Quinlan v. Personal Trans. Servs. Co.,* 329 F. App'x 246, 249 (11th Cir. 2009) (unpublished) (finding that the pretrial detainee's complaints of a headache for several hours after being denied use of his asthma inhaler, difficulty breathing, temporary chest pain, and lingering back pain that caused him to walk hunched over, which resulted from him being transported in a smoked-filled van while handcuffed, were not greater than *de minimis* and therefore did not provide the necessary physical injury to recover for mental and emotional injuries since the conditions did not require immediate medical attention or indicate a physical injury besides discomfort); *Jennings v. Mitchell,* 93 F. App'x 723, 725 (6th Cir. 2004) (unpublished) (finding that the inmate failed to allege more than *de minimis* injury for being sprayed with pepper spray after repeatedly disobeying a direct order as "he merely was uncomfortable in the ordinary fashion of persons exposed to pepper spray" and was at no time in respiratory distress); *Todd v. Graves,* 217 F.

Supp.2d 958, 960 (S.D. Iowa 2002) (finding that dizziness is not a physical injury for the purposes of § 1997e(e) as it does not pass the *de minimis* test).

In regard to the two shoves that plaintiff claims he was given by defendant Brown, plaintiff offers the affidavit of inmate Cart, who states that plaintiff stood next to defendant Brown at the officer's station while defendant Brown "holding [plaintiff's] arm shoved him at the wall and [plaintiff's] head hit the wall. [Plaintiff] looked like he was angry and tried to pull away from [defendant] Brown and then [defendant] Brown took his hand and pushed [plaintiff's] head into the wall." (Doc. 65 at 68). Neither inmate Cart or plaintiff described a visible injury resulting from a shove, much less a specific, serious injury, as having occurred to plaintiff. Plaintiff simply states that he had a "head injury and dizziness" without further factual development showing an injury that is more than temporary and minor. And, apparently, plaintiff made no subsequent complaints to medical personnel when they examined the tension of the straps of the restraint chair on him.

The well-established law is "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), *overruled on other grounds by Graham v. Connor,* 490 U.S. 386 (1989).[12] In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments

---

[12]     The *Johnson* court noted that "[c]ertainly the constitutional protection is nowhere nearly so extensive as that afforded by the common law tort action for battery . . . . Although 'the least touching of another in anger is a battery,' . . . , it is not a violation of a constitutional right actionable under 42 U.S.C. § 1983." *Johnson*, 481 F.2d at 1033 (citations omitted).

necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort ''repugnant to the conscience of mankind.''" *Id.* at 9-10 (citations omitted). *Cf. Nolin v. Isbell*, 207 F.3d 1253, 1258 n. 4 (11th Cir. 2000) (finding that in an arrest situation that the "Appellant . . . merely grabbed Appellee and shoved him a few feet against a vehicle, pushed Appellant's knee into Appellee's back and Appellee's head against the van, searched Appellee's groin area in an uncomfortable manner, and placed Appellee in handcuffs[, resulting in] . . . minor bruising which quickly disappeared without treatment, [fell] . . . well within the ambit of the de minimis force principle . . . . In fact, the facts sound little different from the minimal amount of force and injury involved in a typical arrest.") (Fourth Amendment excessive force claim).

In the present action, taking the allegations in a light favorable to plaintiff, no evidence is before the Court indicating that the force used by defendant Brown was more than minimal. Thus, the shoving incident appears to be one of minor contact involving minimal force, from which plaintiff sustained at the most *de minimis* injuries.

Accordingly, plaintiff cannot recover compensatory and punitive damages for his emotional and mental suffering connected to being sprayed and to being shoved because he did not sustain a physical injury that was greater than *de minimis*.

### 3. **Incident of March 25, 2012.**

Plaintiff complains that as a result of defendant Bradley discharging a pepper spray ball when he cleared the air out of the line of his pepper spray rifle, plaintiff suffered a temporary loss of vision, extreme burning of his eyes, fits of coughing, a burning and irritated throat, an inability to breathe, pain when trying to breathe, and

burning skin. (Doc. 1 at 3-4). When the gun was discharged, it was pointed at the floor and was not directed at plaintiff or in the immediate vicinity of plaintiff, as plaintiff was in the shower. (Doc. 1 at 3). While on the other hand, defendant Bradley and the officers behind him were splattered with pepper spray. (Doc. 34-2 at 3). Plaintiff complains that fumes from the pepper spray were overwhelming but does not complain about the spray landing on him. (Doc. 56-1 at 18, inmate Dixon's affidavit).

Thus, plaintiff's respiratory, skin, and eye complaints are the result of being exposed to the fumes from the pepper spray. Plaintiff does not describe his physical injuries as being permanent, nor does he indicate that he requested medical attention at that time or afterwards. Therefore, the Court concludes that plaintiff's physical injuries resulting from the discharge of the pepper spray rifle are not greater than *de minimis* and § 1997e(e) bars his claims arising from this incident for compensatory and punitive damages.

### 4. Incident of April 13, 2012.

Plaintiff was housed in a cell with inmate Brent Jacoby who became unruly, which caused officers to come to their cell and defendant Rowell to spray inmate Jacoby with pepper spray. (Doc. 1 at 11). Plaintiff claims that he was sprayed as well. (*Id.*). Defendants claim otherwise and state that the spray was directed at inmate Jacoby, that plaintiff was in the corner with a sheet and towel over his head, and that the spray did not reach him. (Doc. 34-5 at 3; Doc. 34-8 at 3). Then, in a subsequent unsworn document, plaintiff claims that he had a t-shirt tied around his face, chides defendants' conclusion that the material was a towel and a sheet, and directs them to look at the video. (Doc. 65 at 23). Plaintiff further states that "he was in a corner, but this was less than 3 ft from the

area where mace was deployed on Jacoby[ ]" and claims mace landed on him, which was intentional. (Doc. 65 at 23). These additional facts provided by plaintiff cast the complaint's allegation in a different light, causing the Court to conclude that defendants' position regarding the spraying more accurately portrays the events that took place. *Cf. Battle v. Central State Hosp.,* 898 F.2d 126, 130 n.3 (11th Cir. 1990) ("[A]llegations that are contradicted by other allegations in the complaint may also constitute grounds for dismissal."). Furthermore, this information is contrary to a finding that the spraying was intentionally directed to plaintiff.

The fact that plaintiff was not the intended target or in the direct path of the spray, was three feet away from inmate Jacoby in a corner, and had covered his head with fabric diminishes the amount of spray that would have landed on him, particularly his face. Plaintiff claims that his body and clothes were contaminated with pepper spray and that the smell was so strong in the cell that he started choking and coughing, struggled to breathe, and began to itch and burn. (Doc. 1 at 12). Plaintiff left the cell and remained outside of it. (Doc. 1 at 13). Plaintiff claims that he was not treated by the medical staff for his burning skin and eyes, nor allowed to rinse his eyes and face and change clothes. (Doc. 1 at 13). He was left in this condition for eight hours in the restraint chair during which time he urinated on himself. (Doc. 1 at 13).

Again, some of plaintiff's physical complaints are typical physical responses to exposure to pepper spray. His physical responses, however, should have been lessened by the fact that he covered his head with material to avoid exposure to the spray and fumes. Furthermore, plaintiff does not state when his symptoms went away, nor does he identify a permanent or long-lasting physical injury. In light of the evidence, the Court

finds that plaintiff did not sustain an injury that was greater than *de minimis*. *See Davis v. Marengo Cnty. Jail,* CA No. 07-0662-CG-C, 2008 WL 3852664, at *6 (S.D. Ala. Aug. 18, 2008) (finding that no constitutional violation occurred when plaintiff's cell which held a disruptive cellmate was sprayed with pepper spray, as the use of physical force was avoided); *Reeves v. Jenson,* 2005 WL 2090896, at *1 (W.D. Mich. Aug. 30, 2005) (finding that plaintiff's injury was not greater than *de minimis* as his cell mate was sprayed with mace and he only alleged that he was became "ill"). Thus, plaintiff cannot recover compensatory and punitive damages on this claim as 42 U.S.C. §1997e(e) bars them.

In each instance complained about by plaintiff, the evidence before the Court at this time does not show that plaintiff sustained a physical injury that is greater than *de minimis*. Therefore, section 1997e(e) bars plaintiff from recovering compensatory and punitive damages on his claims for mental and emotional injury.

### 5. Nominal Damages and Injunctive Relief.

In addition to compensatory and punitive damages, plaintiff requested nominal damages, which are not precluded by § 1997e(e). *Al-Amin,* 637 F.3d at 1198 (citing *Smith v. Allen*, 502 F.3d 1255 (11th Cir. 2007)). "[N]ominal damages, of which $1 is the norm, are an appropriate means of vindicating rights whose deprivation has not caused actual, provable injury." *Kyle v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999); *see Carey v. Piphus*, 435 U.S. 247, 266-67 (1978) (holding if plaintiffs were entitled to nominal damages for the mere violation, the damages should not exceed one dollar). Thus, plaintiff can proceed on his request for nominal damages.

Plaintiff also requested injunctive relief against the Baldwin County Corrections Center. (Doc. 1 at 21). Section 1997e(e) does not bar injunctive relief. *Al-Amin,* 637 F.3d at 1196 (citing *Harris,* 190 F.2d. at 1228). However, injunctive relief becomes moot up the transfer of a prisoner away from the conditions about which he complains. *Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir.), *cert. denied*, 488 U.S. 1046 (1989). This is the situation in the present action. Plaintiff was transferred from the BCSCC to the custody of ADOC, where he presently resides. (Docs. 7, 88). Thus, plaintiff's request for injunctive relief is moot.

Furthermore, the entity from which plaintiff seeks injunctive relief, Baldwin County Corrections Center, is not a defendant to this action. Nor could it be a defendant as it is not an entity capable of being sued. *Daniels v. Baldwin Cnty. Corrs. Ctr.,* 2011 WL 3040905, at *1 n.1 (S.D. Ala. June 23, 2011) (unpublished) (citing *Dean v. Barber,* 951 F.2d 1210, 1214 (11th Cir. 1992)).

**B. Grievance Procedure.**

Defendants assert that plaintiff is required to exhaust his claims through BCSCC's grievance procedure as required by 42 U.S.C. § 1997e(a). (Doc. 34 at 33-35). Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). This statute requires that an inmate exhaust administrative remedies that are available to him before initiating a § 1983 action. *Woodford v. Ngo,* 548 U.S. 81, 85 (2006). Exhaustion is now mandatory when an administrative procedure is in place, (*id.*), and "applies to all inmate suits about prison

life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). "Because 'exhaustion is now a pre-condition to suit,' courts lack discretion to waive the exhaustion requirement." *Smith v. Terry,* 491 F. App'x 81, 83 (11th Cir. 2012) (unpublished) (quoting *Alexander v. Hawk,* 159 F.3d 1321, 1325-26 (11th Cir. 1998)).

To support their affirmative defense of failure to exhaust administrative remedies regarding certain claims, defendants attached a copy of the grievance policy from the Inmate Handbook dated May 15, 2012. (Doc. 35-2 at 2-4). This grievance procedure was issued after all three incidents occurred, i.e., after March 10, 2012, March 25, 2012, and April 13, 2012. Therefore, it is not applicable to plaintiff's claims. Defendants should have attached a copy of the grievance procedure that was in effect at the time of plaintiff's claims arose.

Defendants identified specific claims that are unexhausted, namely, "that Sheriff Mack or Major Byrne have implemented unconstitutional policies at the Corrections Center; that Baldwin County is responsible for allegedly unconstitutional policies implemented by Sheriff Mack and Major Byrne; that Officers Keers, Rowell, Boyington, Aldrete and McNeal violated rights guaranteed to Plaintiff by the U.S. Constitution on April 13, 2012; or that Plaintiff was forced to urinate on himself while in a restraint chair." (Doc. 34 at 36). Defendant Mack also states that he "has not received an appeal from the Plaintiff regarding any response he received to a grievance or other communication regarding the above-mentioned allegations." (Doc. 40-1 at 4).

The grievance procedure that was in effect at the time of the complained of incidents is not before the Court. Therefore, defendants' affirmative defense of failure to

exhaust administrative remedies is due to be denied.  In the event, defendants file a new

motion for summary judgment, properly supported by the grievance procedure in effect at

the time plaintiff's claims arose, defendants would need to address the copies of the

grievances that plaintiff attached to his pleadings (presumably to which a response was

given and which correspond to a claim that he is advancing) and identify each of

plaintiff's claims stating whether the claim is exhausted or unexhausted and their

reasoning for exhaustion or lack of exhaustion.[13]

### C.  Claims Against Defendant Baldwin County.

Defendants assert that defendant Baldwin County cannot be held liable for any

injuries suffered by plaintiff from the sheriff's management of BCSCC.  (Doc. 34 at 48).

Plaintiff claims that defendant "Baldwin County is responsible as a municipality for

unconstitutional policies and practices of it[]s subordinates which violated [plaintiff's]

right to adequate medical [care] and to be free from un[n]ecessary use of excessive force."

(Doc. 1 at 14).  In support of this claim, plaintiff alleges that defendant Mack had on

April 13, 2012 "an unconstitutional policy that allowed [him] to be sprayed with mace

because [he was] housed with an unruly inmate, and because this same use of force

policy allowed for [him] to be placed in a restraint chair for punitive reasons which

serve[d] no peneological interest."  (*Id.* at 17).

Plaintiff's claims against defendant Baldwin County arise from how inmates are

managed in the daily operation of BCSCC.  Even though an Alabama county has some

duties to a county jail, "none of [its] duties relate[] to the daily operation of the jails or to

---

[13]   The Court is aware that BCSCC in the past had a grievance procedure for
inmates.  *See Daniels v. Baldwin Cnty. Corrs. Ctr.,* 2011 WL 3040905, CA 09-0726-KD-
B (Doc. 17-7 at 5-7) (S.D. Ala. June 23, 2011).  The Court, however, does not have
knowledge of the specific policy that was in effect when plaintiff's claims arose.

the supervision of inmates[,]" which is the nature of plaintiff's claims. *Turquitt v. Jefferson County, Ala.*, 137 F.3d 1285, 1289 (11th Cir.), *cert. denied,* 525 U.S. 874 (1998).

The duty of an Alabama county with respect to its jail is "'limited to funding the operation of the jail and to providing facilities to house the jail.'" *Id.* (quoting *Stark v. Madison Cnty.,* 678 So.2d 787, 787 (Ala.Civ.App.1996)). This duty of the county has been construed to be limited to erecting the jail and maintaining its physical plant. *Id.* at 1290. "The County has no authority to manage the sheriff's employees.[,]" *id.* at 1289, inasmuch as the sheriff is not an employee of the county but is an executive officer of the State. *Id.* at 1288. That is, "the sheriff's authority over the jail is totally independent of the [county]." *Id.* at 1289 (quoting *King v. Colbert Cnty.,* 620 So.2d 623, 625 (Ala.1993)). Thus, defendant Baldwin County cannot be held liable on plaintiff's claims in this action, and the claims against defendant Baldwin County are frivolous as a matter of law. *See Neitzke v. Williams,* 490 U.S. 319, 325, 327 (1989) (holding that a claim may be dismissed as "frivolous where it lacks an arguable basis in law or fact[,]" such as when a claim seeks to enforce a right that clearly does not exist).

## IV. Conclusion.

Based upon the foregoing reasons, it is recommended that defendants' motion for summary judgment be granted, in part, and denied, in part. It is recommended that the summary judgment motion be granted to the extent that plaintiff's claims for compensatory and punitive damages be dismissed without prejudice pursuant to 42 U.S.C. § 1997e(e), *see Napier*, 314 F.3d at 531 (holding that an action barred by § 1997e(e) should be dismissed without prejudice), his claim for injunctive relief be

dismissed as moot, and his claims against defendant Baldwin County be dismissed with prejudice as frivolous.  It is further recommended that defendants' affirmative defense of failure to exhaust administrative remedies be denied and that plaintiff's claims for nominal damages proceed in this action.

### Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b); S.D. ALA. L.R. 72.4.   The parties should note that under Eleventh Circuit precedent, "the failure to object limits the scope of [] appellate review to plain error review of the magistrate judge's factual findings."  *Dupree v. Warden, Attorney General, State of Alabama,* 715 F.3d 1295, 1300 (11th Cir. 2011).   In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this 12th day of November, 2013 .


s/ WILLIAM E. CASSADY
UNITED STATES MAGISTRATE JUDGE