IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DONALD EUGENE GARDNER,          :
(AIS # 283161)
                                :
        Plaintiff,
                                :
vs.                                            CIVIL ACTION 12-0281-CG-C
                                :
HEUY MACK, *et al.*,
                                :
        Defendants.

## REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983.  This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4).  The Court, after considering the pleadings on file and determining that there are no genuine disputes of material facts surrounding the issues of Eighth and Fourteenth Amendment constitutional violations, gave adequate notice to the parties of its intention to recommend the entry of judgment on behalf of all defendants pursuant to Federal Rule of Civil Procedure 56(f)(3) (Doc. 137).  There being no showing by the Plaintiff that material facts exist, it is now recommended that summary judgment be granted in favor of Defendants Mack, Byrne, Bradley, Brown, Aldrete, Rowell, McNeal, Keers, and Boyington, and the claims presented by Plaintiff be dismissed with prejudice.

## I.    Summary of Alleged Facts[1]

---

[1]    The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.  *Priester v. City of Riviera Beach, Fla*, 208 F.3d 919, 925 n.3 (11th Cir. 2000) (citations and internal quotation marks omitted); *see Cottone v. Jenne*, 326 F.3d 1352 n.1 (11th Cir. 2003) ("Because we must accept the allegations of plaintiffs' amended complaint as true, what we set out in this opinion as 'the facts' for Rule 12(b)(6) purposes may not be actual facts.").  Nevertheless, for summary judgment

Plaintiff was booked into the Baldwin County Corrections Center ("BCCC") on September 7, 2011, on charges of third degree burglary and ultimately sentenced, after conviction, to four years incarceration on April 12, 2012. (Doc. 34-4 at 2-3). Defendants contend "Plaintiff was a constant and extreme trouble-maker during his incarceration. Plaintiff consistently challenged jail staff authority and was subject to disciplinary action numerous times. Plaintiff was frequently confrontational, antagonistic and went to great lengths to attempt to anger and manipulate jail staff." (Docs. 34-1 at 2; 34-2 at 2-3; 34-3 at 2-3). Defendants further deny ever using more force against Plaintiff than necessary to overcome Plaintiff's resistance to officer's actions. (Docs. 34-1 at 7; 34-3 at 5, 6; 34-4 at 3)

## Claim 1: Excessive Force Used on March 25, 2012.

In response to a disturbance in F-block on March 25, 2012, Defendant Bradley retrieved an FN303 pepper ball spray gun[2] to assist in controlling a combative, unruly inmate; however, the spray gun ultimately was not used as the inmate complied with orders. (Doc. 34-2 at 3). Upon exiting F-block, Defendant Bradley "attempted to release the air pressure in the FN303 and accidently discharged a pepper-spray projectile ball onto the floor by the door leading out of the block."[3] (*Id.*). The spray gun was "pointed

---

purposes, the Court's analysis begins with a description of the facts in the light most favorable to Plaintiff and disregards legal conclusions and recitations of the basic elements of a cause of action. *See Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011); *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009).

[2]     The FN303 spray gun uses air pressure to propel pepper spray balls from greater distances than regular cans of pepper spray. (Doc. 34-2 at 3).

[3]     "At the time of this incident, Baldwin County Sheriff's Office Corrections Center policy did not prohibit or advise against releasing air pressure from an FN303 inside of a cell block. Since this incident, policy of the Baldwin County Sheriff's Office Corrections Center provides that the air pressure from the FN303 be released outside of

downwards towards the floor" when Bradley attempted to release the air pressure and pepper spray was discharged onto the floor.  (*Id*.). All inmates in F-block were housed inside their cells during the incident (*id*.), even though Plaintiff originally alleges that he was in the shower room.  (Doc. 1 at 3).[4]  Plaintiff further alleges that Defendant Bradley "intentionally fired his weapon to harass and cause harm to [Plaintiff]."  (Doc. 65 at 18).  According to Defendant, no inmate reported suffering from the effects of the inadvertently discharged pepper spray and none requested medical care at that time (doc. 34-2 at 4), but Plaintiff maintains he and other inmates "were coughing and choking and . . . hollering at Bradley to do something."  (Doc. 65 at 20).  Defendant Bradley declares, and Plaintiff fails to dispute, the area of the floor contaminated with the chemical was cleaned immediately following the incident.  (Doc. 34-2 at 3; *see* Doc. 65 at 18-22).

**Claim 2:  Excessive Force Used on March 10, 2012.**

Subsequent to an altercation with another inmate on March 10, 2012,[5] Plaintiff

---

Corrections Center facility.  (Doc. 34-2 at 5).

[4]   It does not matter if Plaintiff was in a shower room as opposed to his cell – this was clearly an accident and no injuries were reported or medical attention requested.

[5]   Plaintiff claims he was attacked by inmates Timothy Betts and Emmanuel Jones on March 10, 2012, prior to being placed in segregated housing with Kendrick Leonard. (Doc. 1 at 5; Doc. 65 at 10).  Plaintiff had not reported these two inmates as enemies at the time he was booked into Baldwin County Corrections Center.  (Doc. 34-4 at 8).  Nor did he warn officers that he was in danger by being housed with said inmates prior to the attack.  (*Id*.).  On March 10, 2012, while housed in E pod, inmate Emmanuel Jones attacked plaintiff and then five minutes later inmate Timothy Betts attacked him. (Doc. 1 at 21).  These assaults occurred when plaintiff was housed in the high-max section, which consists of four separate dormitories, housing 130 inmates, who are mostly violent felony offenders.  (Doc. 1 at 17).  "Plaintiff was taken to medical and treated for cuts, bruising, and swelling to his face, hands, and body." (Doc. 1 at 18).  Plaintiff and inmate Betts were both found to be at fault and both were placed on disciplinary status. (Doc. 34-4 at 8).  It is Plaintiff's claim that "Emmanuel Jones was not caught," because

was placed on disciplinary status, transferred to the segregated housing unit, F-block, and placed in a cell with inmate Kendrick Leonard.  (Doc. 65 at 10).  Due to the earlier inmate attack, Plaintiff was overly fearful of another attack by his new cellmate, Leonard.  (*Id.*).  Plaintiff alleges he informed Corporal Pettway and Officer John Doe that "he felt threatened and was afraid of his cell-mate" and requested to be moved to another cell.  (Doc. 1 at 5).  Defendant Brown, on the other hand, affirms that Corporal Pettway warned Brown that Plaintiff was seeking a cell transfer[6] and that Plaintiff would likely continue his efforts to be moved.  (Doc. 34-3 at 3).  Contrary to this assertion, Plaintiff alleges he requested to be moved because Leonard "was being aggressive, making threatening statements, laughing for "<u>No</u>" reason, spitting everywhere, said he was crazy, and needed psyche meds, and had killed people before, and stated he knew Emanuel Jones,"[7] who was one of the inmates engaged in the fight with Plaintiff earlier that day.  (Doc. 65 at 10).

Defendant Brown was working inside the control room on March 10, 2012, when Plaintiff began to repeatedly press the intercom button to call Defendant Brown and request a cell transfer because he was not getting along with his cellmate.  The request was denied by Defendant Brown because Brown did not believe Plaintiff's statements were true but stated he would check on Plaintiff later to be sure Plaintiff was okay.

_____

the jail lacks adequate video monitoring of the facility and cells.  (Doc. 65 at 10). Plaintiff was then transferred to cell 6 in F-block, which is in the segregated housing unit ("SHU") and housed with Kendrick Leonard.  (Doc. 1 at 5; Doc. 34-4 at 9).

[6]     The request was denied because the defendants found that plaintiff was simply seeking to be housed with a friend. (*See* Doc. 34-3 at 3).

[7]     In support of his claims, Plaintiff submits an affidavit by Inmate Aaron Cart which states that Plaintiff "told [Cart] that he was gonna move into [Cart's] cell," prior to ever speaking with or notifying Corporal Pettway and Officer John Doe about his fears of cellmate Leonard.  (Doc. 56-1 at 22).

(Doc. 1 at 5).  Defendant Brown asserts he "left the speaker on [in Plaintiff's cell] so [he] could hear what was being said by Plaintiff in his cell.  [Defendant] heard Plaintiff tell his cellmate 'They are gonna move me one way or another.' . . . Plaintiff told his cellmate: 'when they come just tell them we're not getting along or something.'"  (Doc. 34-3 at 3).  Following plaintiff's third use of the intercom button, he was warned by Defendant Brown that a transfer was not in the "offing" but that he would be written up if he did not cease pressing the panic/call button.  (*Id.*).  Plaintiff, however, failed to heed the warning and, instead, continued to press the panic button and began to repeatedly kick his cell door.  (*Id.* at 4).  Again, Plaintiff was warned over the intercom system to stop the disorderly conduct, but he refused.  (*Id.*).  A supervisor authorized Brown to use assistance from other officers, to use pepper spray and the restraint chair if Plaintiff continued to disobey orders to stop his disruptive behavior.  (*Id.*).  Plaintiff was warned "several more times" of the consequences if he proceeded to disobey orders, including the use of pepper spray on him and being restrained in a chair (doc. 1 at 6); however, Plaintiff continued to kick the cell door.  (*Id.*; Doc. 34-3 at 4).  Due to Plaintiff's behavior and failure to follow officers' orders, Defendant Brown[8] entered Plaintiff's cell, where Plaintiff claims he had assumed a "defenseless position" on his knees with his hands behind his head.  (Doc. 1 at 7).  Despite Plaintiff's yelling "I am not resisting," Defendant Brown administered one one-second burst of pepper spray from approximately four feet away.[9]  (Doc. 34-3 at 4; Doc. 35-5 at 7).  It is clear from the video

_____

[8]     Officer Arnold accompanied Defendant Brown to Plaintiff's cell along with Corporal Sanders who had a camera to record the incident.  (Doc. 1 at 6-7).

[9]     In his unsworn traverse, Plaintiff disputes Defendant Brown's version of the incident and states he was located less than two feet away from Defendant Brown when Brown sprayed him for more than one second with pepper spray.  (Doc. 65 at 15).

5

evidence presented by Defendants in discovery, that Plaintiff was able to duck his head resulting in the spray making contact with the back of his head. Compliant, Plaintiff was handcuffed and taken to the "pod" area where officers are stationed.  (Doc. 1 at 8). While standing handcuffed against the wall, Plaintiff contends Defendant Brown "shoved" Plaintiff's head into the wall while stating, "do you like that Mother fucker?" (*Id*.).  Plaintiff responded by "yell[ing] loudly and clearly don't bang my head against the wall Bitch."  (*Id*.).  Responding to Plaintiff's remark, Officer Brown "again shoved Plaintiff's head into the wall and told Plaintiff to shut the Fuck up."  (*Id*.).

Inmate Aaron Cart avers he witnessed the incident between Plaintiff and Defendant Brown.  (Doc. 56-1).  Cart alleges, while Plaintiff was handcuffed and being escorted to the pod area, "Officer Brown while holding Donald[']s arm shoved him at the wall and Donald[']s head hit the wall.  Donald looked like he was angry and tried to pull away from Officer Brown and then Officer Brown took his hand and pushed his head into the wall."  (*Id*. at  23).

The incident occurred just before a shift change; therefore, Plaintiff was placed in the restraint chair without decontamination of the pepper spray during the shift change. (*Id*. at 5).  Defendant alleges that after the shift change Plaintiff was decontaminated and given a clean uniform before being returned to the restraint chair.  (*Id*.).  Plaintiff contends, however, he was not allowed to decontaminate himself in a proper shower but instead was forced to use a "a filthy mop closet and was forced to use a rubber hose that was lying in a cesspool of stagnant water that smelled awful and that he never was allowed to shower to rinse off the mace, nor was he given a clean uniform and that the mace was all over plaintiff all the way until the next day."  (Doc. 65 at 15).  A member of the medical staff checked the straps on the chair; Plaintiff was released from the chair,

every two to four hours, to use the bathroom, and released every one and a half to two hours to stretch his body.  (Doc. 34-3 at 5).  Defendant Brown affirms that inmates remain in restraint chairs for approximately six to eight hours.[10]  (*Id*.).  Following the incident, Plaintiff received a disciplinary for harassing Brown and other staff due to his action in continuing to press the panic button unnecessarily after being ordered to stop.  (Doc. 1 at 9).  Furthermore, the record is void of any injuries suffered by Plaintiff or of evidence or complaints of sustained injuries.[11]

**CLAIM 3:  Excessive Force Used on April 13, 2012.**

On April 13, 2012, Brent Jacoby was placed as a cellmate in Plaintiff's segregated housing unit cell.  (Doc. 1 at 11).  Upset with officers because certain personal possessions were missing from his transferred items to the segregation unit cell, Jacoby became irate and began kicking and banging on the cell door, yelling at the officers, and pressing the panic button demanding attention.  (*Id*.).  Defendants Keers, Rowell, and Boyington entered the cell door and ordered Jacoby to get on the ground.  (*Id*.).  When Jacoby failed to obey the order, Rowell entered the cell and administered pepper spray.  (*Id*. at 12).  Keers forced Jacoby to the ground and Rowell continued to spray Jacoby.  (*Id*.).  Defendants aver that pepper spray was never aimed at Plaintiff, that Plaintiff's face was covered with a cloth to protect him from the spray, and Plaintiff could only have been indirectly and minimally affected by the spray.  Plaintiff, however, asserts he

---

[10]    Defendants further assert that restraint chairs at BCCC are not used for punishment; rather they "are only utilized when an inmate threatens physical harm to themselves [sic], Corrections Center staff or another inmate."  (Doc. 34-4 at 6).

[11]    Plaintiff suffered only the typical, temporary responses to the administration of pepper spray by Brown, including burning and irritated skin, trouble breathing, loss of sight.  (Doc. 1 at 7).  Plaintiff makes a conclusory statement that he "suffered head injury and dizziness" but this statement is not supported by medical records, a request for medical attention, or a time reference as to how long the symptoms lingered.  (*Id*.).

7

was standing approximately three feet from Jacoby and was sprayed directly, but admits having a t-shirt tied around his face and head to block the chemical agent. (Doc. 1 at 12; Doc. 65 at 23-24).

As soon as Jacoby was secured in handcuffs, Plaintiff was permitted out of the cell and into the dayroom. (Doc. 34-1 at 3). Plaintiff asserts he was "bent over coughing, wretching, [sic] and gasping for fresh air." (Doc. 65 at 24). However, Defendants contend "Plaintiff was not choking, coughing or having trouble breathing" at the time he exited the cell, and Defendants observed no signs indicating Plaintiff was suffering from the effects of pepper spray at that time. (Doc. 34-1 at 3). Plaintiff did complain about pepper spray being in his cell and on his bedding; the Defendants responded to these complaints by giving Plaintiff a mop bucket containing cleaning solution and a mop to remove any pepper spray remaining in the cell. (Doc. 34-1 at 3). Plaintiff failed to clean his cell, however, because he claims the mop water was "filthy stinky" water. (Doc. 65 at 25). Plaintiff was also instructed to remove any contaminated items from his cell and place them outside his cell so they could be replaced (Doc. 34-1 at 3), but Plaintiff failed to remove any items as instructed by Defendants because he alleges the cell smelled so strongly of chemicals that he was unable to breathe inside the unit (Doc. 65 at 25).

Approximately 15 minutes after the administration of pepper spray in Plaintiff's cell, Plaintiff was ordered by Defendants Aldrete and McNeal to return to his cell and "lockdown" for a shift change in officers, per Baldwin County Corrections Center policy. (Doc. 34-1 at 3). Plaintiff refused this order "several times," and "repeatedly screamed, cursed and yelled that he would not lockdown" due to the contaminated condition of his cell. (Doc. 34-1 at 3). Defendant Aldrete maintains that he "reminded

Plaintiff he would be provided with clean bedding, towels and a uniform after lockdown;" however, "Plaintiff continuously refused to go into his cell and continued to scream." (Doc. 34-1 at 4). Plaintiff maintains that Defendants did not "even investigate the condition of [his] cell, but just assumed he was lying [about the odorous fumes]." (*Id*. at 27). Subsequent to Plaintiff's failure to obey orders, a supervisor authorized the calling of available officers to assist Defendant Aldrete and 13 officers responded.[12] (Doc. 34-1 at 4). When the officers arrived, Plaintiff was standing in the dayroom covering his head with a white cloth material. (Doc. 34-1 at 4). Defendants state, and Plaintiff denies, as they approached Plaintiff, Plaintiff threw the mop bucket in their direction causing water to spill all over the dayroom floor and into the hallway, that Plaintiff held up a mop and appeared to use it as a weapon and stated to the officers, "come get me" as he continued to verbally announce he would not go back into his cell. (Doc. 34-1 at 5; Doc. 65 at 28). Plaintiff continuously refused orders to lay on the floor until Sergeant Graves entered with a FN303 pepper ball gun, at which time Plaintiff complied with the orders. (Doc. 34-1 at 5). Because Plaintiff complied with the order and did not resist, pepper spray was not used.[13]

After being handcuffed, Plaintiff was taken to the restraint chair. (Doc. 34-1 at 5). Defendants contend Plaintiff verbally resisted being place in the chair by yelling obscenities and cuss words and also physically resisted being place in the chair, although Defendants give no details describing such physical resistance. (Doc. 34-1 at 5-6). Once restrained, medical personnel checked the straps of the restraint chair to

---

[12]    Defendant asserts the large response was due to the occurring shift change so more officers than normal were available to provide assistance. (Doc. 34-1 at 4).

[13]    After Plaintiff was secured, Defendant McNeal, along with other officers, entered Plaintiff's cell and noted that the cell did not smell of pepper spray. (*Id*. at 5).

ensure its tension was safe.  (Doc. 34-1 at 6; Doc. 40-2 at 5).  During the exam and

thereafter, Plaintiff continued to be belligerent.[14]  (Doc. 34-1 at 6; Doc. 34-8 at 6).

Plaintiff claims he was "being belligerent [while restrained in the chair] because officers

and medical staff would '<u>not</u>' treat his burning eyes and skin, nor would they allow him

to change clothes even after they were aware that plaintiff was complaining about

burning skin and eyes and requesting clothes and to rinse off politely at first."  (Doc. 65,

at 30).  Defendants, however, contend Plaintiff's resistance and complaints centered on

his contaminated cell and pepper spray being on his bedding and his cell mat, but never

did Plaintiff complain about having pepper spray on his body, nor suffering from the

effects of pepper spray, nor did he appear to be choking, coughing, or having trouble

breathing.  (Doc. 34-1 at 6).

      Plaintiff further alleges, and Defendants deny (Doc. 34-1 at 7), that Plaintiff

urinated on himself while restrained in the chair.  (Doc. 65, at 31).  Plaintiff states, he

> was literally raising Hades about needing to pee and became hostile and
> very vocal when he could no longer hold it and urinated on himself.  Cpl.
> Johnson and Officer Morse said they needed permission from the Sargeant
> to let [him] pee, but were not authorized to let [him] yet.  Cpl. Johnson did
> allow plaintiff to shower after he urinated on himself and to have new
> clothing too.[15]

(*Id*.).

## CLAIM 4:  Failure to Supervise; Failure to Protect.

---

[14]    Although Defendant Keers did not participate in restraining Plaintiff in the chair, while he was performing his visitation duties, Defendant Keers walked past Plaintiff while in the restraint chair, and "Plaintiff was extremely angry and combative . . . swearing and cursing . . . and stated to [Defendant Keers] that he hoped that [Defendant Keers'] wife and kids get raped."  (Doc. 34-5 at 3-4).

[15]    Inmate Jacoby in his sworn affidavit states that he saw Plaintiff being placed in the restraint chair and that Plaintiff and he were not permitted to use the bathroom for four hours resulting in them urinating on themselves, nor could they rinse off their skin and clothes until about eight hours later.  (Doc. 45 at 4-5).

Plaintiff claims that Defendants Mack and Byrne are responsible for having inadequate and/or unconstitutional policies in place at the Baldwin County Corrections Center that caused him to suffer excessive force at the hands of officers. (Doc. 1 at 16). Plaintiff contends Defendants allow officers to administer chemical spray on inmates confined in cells with compliant cellmates, causing the innocent bystander to be exposed to the chemical agents as well. (Doc. 1 at 11). He also claims that Defendants have in place unconstitutional policies allowing for inappropriate use of restraint chairs. (*Id*. at 14). And Plaintiff alleges that only one POD officer monitors the high security section of the jail which houses approximately 130 of the most dangerous inmates, resulting in a failure to protect inmates, including the March 10, 2012 failure to protect him from attacks by inmates Jones and Betts. (*Id*. at 17-19).

## II.    Procedural Background

On April 20, 2012, Plaintiff filed this § 1983 action against Defendants Baldwin County, Alabama, Sheriff Huey Mack, Assistant Chief Deputy of Corrections Dale Byrne,[16] Sergeant Melvin Bradley, Officer Anthony Brown, Officer David Aldrete, Officer John Rowell, Officer Kendrick McNeal, Officer Joshua Keers, and Officer Mark Boyington, regarding treatment received and incidents that occurred while he was housed as a pretrial detainee at BCCC.[17] (Docs. 1, 84). Plaintiff seeks injunctive relief

---

[16]    The Defendants have filed a suggestion of death in this action giving notice that Defendant Dale Byrne is deceased. (Doc. 95).

[17]    The majority of Plaintiff's complaints occurred while he was housed as a pretrial detainee at BCCC. However, the acts that form the basis of Claim 3 occurred one day after Gardner was sentenced to four years incarceration. (*See* Doc. 34-4 at 2-3). The status of Plaintiff's holding, however, is not imperative to the Court's analysis of his claims. The minimum standard allowed by the Fourteenth Amendment's due process clause is the same as that allowed by the Eighth Amendment to convicted persons. *See Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1396 (11th Cir. 1994). Also, Plaintiff is no

11

requiring "new policies" at BCCC, compensatory damages in the amount of $30,000, punitive damages in the amount of $30,000, an apology from Defendants, and such other relief from the Court as necessary to "make sure defendants can't keep hurting inmates on a daily constant basis, and to make them get evaluated, and get more training using discretion and less force."  (Doc. 84 at 7).  Defendants' answered Plaintiff's complaint and filed a Special Report denying all allegations made by Plaintiff, asserting the affirmative defenses of absolute and qualified immunity, and submitting evidentiary support of their positions.  (Docs. 32, 34, 35, 40, 41, 48).  The Court converted the Defendants' Answer and Special Report into a motion for summary judgment (Doc. 39), and Plaintiff filed his respond to the defendants' dispositive motion.[18]  (Doc. 53).  The Court granted, in part, and denied, in part, the motion for summary judgment, ordering dismissal of all claims against Defendant Baldwin County, denying Defendants' affirmative defense of failure to exhaust administrative remedies, dismissing Plaintiff's claim for injunctive relief as moot, and dismissing Plaintiff's claim for compensatory and punitive damages pursuant to 42 U.S.C. §

---

longer incarcerated at BCCC, causing all injunctive relief to be moot; since the filing of this action, Plaintiff has been transferred to Fountain Correctional Facility in Atmore, Alabama.  (Doc. 89)

[18]    Subsequent to the conversion of Defendants' Answer and Special Report, Plaintiff attempted to file an amended complaint.  (Doc. 56).  The Court declined authorization of the amended complaint because the amended complaint was not filed with the permission of the Court as required by Fed. R. Civ. P. 15(a)(2), and it was not filed on the Court's form in compliance with Local Rule 83.9(d)(1).  (Doc. 61).  However, the Court did grant Plaintiff's motion to allow the documents attached to the amended complaint to be used to support his original complaint.  (Docs. 67, 68).  Plaintiff's "Traverse to Defendants' Special Report" (Doc. 65) is not sworn, nor is an affidavit from Plaintiff attached; Plaintiff does attach affidavits of other inmates.  The affidavit of Charles Shaver, however, is not properly attested and is not being considered.  (*Id.* at 70).

1997e(e).[19]  (Docs. 92, 97).  Plaintiff's claim for nominal damages was allowed to continue.  Therefore, Plaintiff's sole claim for nominal damages based on constitutional violations remains before the Court and is now ripe for consideration.

## II.   Standard of Review

The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."  Fed. R. Civ. P. 56(f)(3).  In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), the Supreme Court held that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ."  However, all of the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).  Given that the Court is considering summary judgment on its own, the Court will view all evidence in the light most favorable to Plaintiff.

Summary judgment is proper when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case."  *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal quotation marks omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable, . . . or is not significantly probative, . . .

---

[19]     Plaintiff filed an  objection to the Magistrate Judge's Report and Recommendation arguing, *inter alia*, that he "did suffer injury, (whether De minimus or not)" (doc. 96 at 1) and that compensatory and punitive damages should be awarded instead of nominal damages (*id.* at 2-6).  The Court, however, adopted the Report and Recommendation over Plaintiff's timely objection thereto.  (Doc. 97).

summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-

50 (1986) (internal citations omitted).  Given that both parties have been given ample

time to submit pleadings and responses and have received notice from the Court the

remaining claims are subject to summary judgment, the Court now is prepared and

ready to recommend that summary judgment be granted in this matter.  See *AGSouth*

*Genetics, LLC v. Cunningham*, No. 09-745-C, 2011 WL 1833016, *2 (S.D. Ala. May 13, 2011)

(After opportunity to respond to a "motion for summary judgment, the court must

grant summary judgment if there is no genuine issue of material fact and the moving

party is entitled to judgment as a matter of law.").

## III.  Analysis

As alluded to earlier, most of  Plaintiff's claims arose while he was a pretrial

detainee at Baldwin County Corrections Center.  As a pretrial detainee, Plaintiff is

protected under the Due Process Clause of the Fourteenth Amendment.  *See Revere v.*

*Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).  In this Circuit, however, it has been

held that "in regard to providing pretrial detainees with such basic necessities as food,

living space, and medical care the minimum standard allowed by the due process

clause is the same as that allowed by the eighth amendment to convicted persons."

*Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994) (quoting *Hamm v. DeKalb*

*Cnty.*, 774 F.2d 1567, 1574 (11th Cir. 1985)); *cf. Hare v. City of Corinth*, 74 F.3d 633, 649

(5th Cir. 1996) ("That pretrial detainees may have more protections or rights in general,

however, does not mean that they are entitled to greater protection of rights shared in

common with convicted inmates."). Accordingly, the Court will utilize an Eighth

Amendment analysis in addressing Plaintiffs' § 1983 claims of excessive use of force.

## A.    Defendants' Immunity from Suit

1.    <u>Eleventh Amendment Immunity</u>

With respect to Plaintiff's claims against defendants in their official capacities, the individual defendants contend that they are entitled to Eleventh Amendment immunity as state officials.  It is well-established that "suits against an official in his or her official capacity are suits against the entity the individual represents." *Parker v. Williams*, 862 F.2d 1471, 1476 n.4 (11th Cir. 1989); *see also Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 690 n.55, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978) (indicating that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"); *Welch v. Laney*, 57 F.3d 1004, 1007 (11th Cir. 1995); *Farred v. Hicks*, 915 F.2d 1530, 1532 (11th Cir. 1990). What entity the defendant officials represent is determined by reference to state law.  *See Welch*, 57 F.3d at 1008.  As a matter of Alabama law, Sheriff Mack is a state officer within the executive department of state government. *See Parker v. Amerson*, 519 So. 2d 442, 443 (Ala. 1987). Likewise, a sheriff's deputies, such as Officers Byrne, Bradley, Brown, Boyington, Keers, and Rowell, are legally an extension of the sheriff and their acts are considered those of the sheriff. *See Mosely v. Kennedy*, 245 Ala. 448, 17 So. 2d 536, 537 (1944).  Accordingly, all defendants in this action are state officials for the purposes of immunity from suit. *See Welch*, 57 F.3d at 1008; *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990).

As such, Plaintiff's claims against the individual defendants in their official capacities are effectively claims against the State of Alabama.  The Supreme Court has held that states and state officials are not "persons" subject to liability under 42 U.S.C. § 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989).  Moreover, pursuant to the Eleventh Amendment to the United States Constitution, a state's own citizens may not

sue it unless the state consents to suit or Congress acts to abrogate immunity. *See Carr*, 916 F.2d at 1524-25. Neither has happened in this case. Therefore, the individual defendants enjoy absolute immunity from the damage claims asserted against them in their official capacities.

      2.   <u>Qualified Immunity</u>

All defendants in this action have invoked the defense of qualified immunity for the claims asserted against them in their individual capacities. "Qualified immunity insulates government actors, in their individual capacities, from civil lawsuits as long as the challenged discretionary conduct does not violate clearly established federal statutory or constitutional rights." *Adams v. Poag*, 61 F.3d 1537, 1542 (11th Cir. 1995); *see also Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1395 (11th Cir. 1994). There can be no dispute that all officers were acting within their discretionary authority at all times when the acts in question occurred. Therefore, defendants are entitled to qualified immunity unless Plaintiff can show that their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. *See Belcher*, 30 F.3d at 1395; *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir. 1997). "General propositions and abstractions do not qualify for bright line, clearly established law. For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Wilson v. Blankenship*, 163 F.3d 1284, 1288 (11th Cir. Ala. 1998) (internal citations omitted). Therefore, the court will now address whether or not this action asserts any constitutional violation.

B.      **Excessive Use of Force**

To establish a constitutional violation for excessive use of force, Plaintiff must first show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation, meaning defendants' conduct "shocks the conscience," *Lumley v. City of Dade City, Fla.*, 327 F.3d 1186, 1196 (11th Cir. 2003), and, second, Plaintiff must show that "the officials act[ed] with a sufficiently culpable state of mind," *i.e.*, that they acted "maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-8 (1992). "Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'" *Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). The factors used to determine whether there has been a violation of the Eighth Amendment in the prison security context are: the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived, any efforts to temper the severity of a forceful response, and the extent of injury suffered. *Hudson*, 503 U.S. at 7 (citing *Whitley*, 475 U.S. at 321).

**Claim 1:      No Excessive Force Used on March 25, 2012.**

It is undisputed that on March 25, 2012, pepper spray was emitted into F block at BCCC where Plaintiff was housed. Whether or not Plaintiff suffered any effects from the chemical agent remaining in the air is in dispute. However, this question is not a genuine issue of material fact that need be determined. The evidence in the record is sufficient for the Court to determine Defendant Bradley did not act with malice or intent to cause harm or injury to any inmate housed in F block, particularly Plaintiff,

17

when he inadvertently discharged the FN303 pepper ball spray gun.

The Eighth Amendment is only violated by "a prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate[.]" *Farmer*, 511 U.S. at 828. To defeat summary judgment on his claim against Defendant Bradley, Plaintiff must present sufficient evidence to show there is a genuine dispute regarding (1) whether a substantial risk of harm existed; (2) whether Defendant was deliberately indifferent to the risk, and (3) whether or not Defendant's deliberate indifference caused harm to Plaintiff. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995).

Plaintiff claims Defendant Bradley "intentionally fired his weapon to harass and cause harm to [Plaintiff]" (Doc. 65 at 18); however, Plaintiff presents no evidence in proof of this allegation. Instead, all evidence shows that Defendant Bradley accidently fired the pepper spray gun within the housing unit – credited by the undisputed fact that Defendant Bradley had the spray gun pointed at the floor when it misfired. There are no allegations that Defendant Bradley made aggressive statements to any inmate prior to the unintentional firing. In fact, it is undisputed that following the inadvertent discharge, Defendant Bradley immediately cleaned the area of the floor contaminated by the pepper spray. (Doc. 34-2 at 3; *see* Doc. 65 at 18-22). Furthermore, BCCC investigated this incident and changed internal policy, following this incident, which now requires the release of air pressure of the FN303 outside the facility. (Doc. 34-2 at 5).

Taking the facts in total, the Court finds no objective or subjective evidence that Defendant acted with deliberant indifference to the safety of Plaintiff, nor did Bradley act intentionally to cause harm to Plaintiff or any inmate, *Hudson*, 503 U.S. at 6-8, nor does this accidental incident "shock the conscience," *Lumley*, 327 F.3d at 1196, to find

18

Defendant Bradley liable for a constitutional violation.  If anything, Defendant Bradley's conduct was negligent, which is insufficient to sustain an Eighth Amendment constitutional violation claim.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (Conduct must be more than mere negligence to state a constitutional claim.); *Board. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) ("A showing of simple or even heightened negligence will not suffice."); *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (Liability cannot be imposed in a § 1983 action for negligent acts.).  Thus, the Court finds that Plaintiff has failed to establish a claim of excessive force against Defendant Bradley.

**Claim 2:  Excessive Force Used on March 10, 2012.**

Plaintiff claims excessive force in violation of the Eighth Amendment was used against him on March 10, 2012, when he was housed with inmate Kendrick Leonard in the segregated housing unit.  Plaintiff claims he felt threatened by Leonard and was denied requests to be transferred to another cell.  Plaintiff also contends that excessive force was used against him by Defendant Brown when Brown needlessly: (1) administered pepper spray to extract him from his cell, (2) twice shoved his head into the wall, and (3) placed him in the restraint chair for upwards of eight hours.  The record is sufficient to determine the constitutionality of these claims, and the Court will analyze each of these issues in turn.

**a.      No violation for failure to protect Plaintiff from cellmate.**

Plaintiff alleges he felt threatened by cellmate Leonard and informed Corporal Pettway, Officer John Doe, and Defendant Brown that he was scared of Leonard.  The record shows that neither Defendant Brown, nor any other officer, was deliberately indifferent to Plaintiff's safety by refusing to remove him from the cell he shared with Leonard.  In order to prove that Defendant Brown should have transferred him from

19

Leonard's cell, Plaintiff must prove that Defendant Brown was deliberately indifferent to a substantial risk of serious harm. "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. 825, 833. Thus, a jail officer's deliberate indifference to a known, substantial risk of serious harm violates the constitution. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013). To meet this standard, Plaintiff must show (1) "a strong likelihood, rather than a mere possibility [of harm] before a guard's failure to act can constitute deliberate indifference," *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal quotation marks omitted) and (2) that the defendant was subjectively aware of the risk of serious harm and chose to disregard the risk by conduct that is more than gross negligence, *Goodman*, 718 F.3d at 1332. There can be no deliberate indifference if (1) the defendant "did not know of the underlying facts indicating a sufficiently substantial danger" and he was therefore unaware of danger, (2) the defendant "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," or (3) the defendant "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Plaintiff alleges he requested a cell transfer because Leonard "was being aggressive, making threatening statements, laughing for "No" reason, spitting everywhere, said he was crazy, and needed psyche meds, and had killed people before, and stated he knew Emanuel Jones." (Doc. 65 at 10). While the Court concedes Leonard's behavior seems disturbing and the Court sympathizes that it would be unnerving to be housed in close quarters with one exhibiting such mannerisms, uncomfortable and intimidating situations are common in high maximum security units of jails and do not, without more, confirm a constitutional violation of Plaintiff's safety.

20

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (Court explained "before a defendant's awareness rises to a sufficient level of culpability, there must be much more than mere awareness of an inmate's generally problematic nature."); *Prater v. Dahm*, 89 F.3d 538 (8th Cir. 1996) (Plaintiff did not allege facts from which an inference of substantial risk of harm could be made; plaintiff alleged only that fellow inmate had made threats against him); *Pickett v. Hart*, No. 7:07-CV-98(HL), 2010 U.S. Dist. LEXIS 26460, 2010 WL 1224024 (M.D. Ga. Jan. 27, 2010) (Defendants had no subjective knowledge of a threat of harm against plaintiff, and did not act in deliberate indifference to plaintiff's situation.).   Notably, Plaintiff fails to articulate one actual threat directed toward him by Leonard; odd behavior alone will not support a finding of a "sufficiently substantial danger."[20]  *McBride v. Rivers*, 170 F. App'x 648, (11th Cir. 2006) (Plaintiff's statement to officer that, "me and that dude had problems.  I'm in fear for my life.  Don't put me in a cell with him" was insufficient to put defendant on notice of a serious risk of harm because Plaintiff failed to "identify a specific prior incident, from which the defendant could infer that a substantial risk existed.").   Therefore, Plaintiff has failed to prove the objective element of his claim.

Even if Plaintiff could satisfy the first element of a deliberate indifference claim, however, he cannot show that Defendant Brown had the requisite mental state to be held liable.  Plaintiff provides no evidence that Defendant Brown knew of a substantial risk of harm to Plaintiff and intentionally acted or failed to act.  Defendant Brown

---

[20]    Also belying Plaintiff's position is the statement of Inmate Cart.  Cart avers that Plaintiff told him, *prior* to ever speaking with an officer or requesting a transfer due to fear of Leonard, "that he was gonna move into [Cart's] cell." (Doc. 56-1 at 22).  The timing of this statement suggests that Plaintiff was not fearful for his safety but simply wanted a different cellmate.

affirms that while working inside the control room on March 10, 2012, he responded to Plaintiff's repeated intercom calls to be transferred to a different cell.  Defendant Brown states he denied the request because he did not believe Plaintiff's statements were true but stated he would check on Plaintiff later to be sure Plaintiff was okay.  (Doc. 1 at 5).  Defendant Brown avers he overheard Plaintiff tell Leonard, "[t]hey are gonna move me one way or another," and Plaintiff then told Leonard that when the officers came to move him to another cell for Leonard to "just tell them we're not getting along or something."  (Doc. 34-3 at 3).  Plaintiff admits making these statements to Leonard, although he states it was just to "keep the peace" in the cell and stave off a fight.  (Doc. 65 at 11).  However, Defendant Brown had no way of knowing that Plaintiff's statements were an organized scheme.  Defendant Brown relied solely on the information provided to him, which included no actual threat of harm, Plaintiff's numerous requests to be moved, and the overheard statements made by Plaintiff to Leonard denoting that Plaintiff merely preferred a different cellmate.  Even taking Plaintiff's statements as true, Plaintiff fails to prove that Defendant Brown had actual knowledge of any threat or harm to Plaintiff.  Thus, Plaintiff fails to demonstrate that Defendant Brown had any responsibility to remove Plaintiff from the cell on March 10, 2012.

The absence of any proof of a constitutional violation or responsibility to remove Plaintiff from Leonard's cell reveals the necessity of Plaintiff's duty then to follow the orders of officers, including Defendant Brown's order, to cease pressing the panic button and to stop kicking on his cell door.  *See Danley v. Allen*, 540 F.3d 1298,  (11th Cir. 2008), *overruled on other grounds as recognized by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010) ("[P]rison guards do not have the luxury or obligation to convince every inmate

22

that their orders are reasonable and well-thought out.  Certainly they are not required

to do so where an inmate repeatedly fails to follow those orders."); *Bennett v. Parker*, 898

F.2d 1530, 1533 (11th Cir. 1990) ("Prison guards may use force when necessary to restore

order and need not wait until disturbances reach dangerous proportions before

responding.").

### b.    No excessive force violation by use of pepper spray.

In providing security, a jail must be concerned about the staff's safety as well as

the inmates' safety.  Inmates in the disciplinary segregation unit of BCCC are there for

failing to obey the rules and regulations of the jail.  Disturbances can arise easily, and

inmates can get noisy and out of control quickly.  And it is an officer's job to quell

disorder before it occurs or as quickly as he can thereafter.

> When an order is given to an inmate there are only so many choices
> available to the correctional officer. If it is an order that requires action by
> the institution, and the inmate cannot be persuaded to obey the order,
> some means must be used to compel compliance, such as a chemical agent
> or physical force. While experts who testified on behalf of the plaintiffs,
> suggested that rather than seek to enforce orders, it was possible to leave
> the inmate alone if he chooses not to obey a particular order, and wait him
> out, experience and common sense establish that a prison cannot be
> operated in such a way.
>
> Discipline in a maximum security correctional institution no doubt is
> difficult, but it is essential if the prison is to function and provide for the
> care, safety and security of the staff and inmates. Services to provide food,
> clothing, health, medical, cleaning, laundry and all other services would
> come to end without discipline. Mob rule would take over. There would
> not, and could not, be any protection for staff or inmates. Orders given
> must be obeyed. Inmates cannot be permitted to decide which orders they
> will obey, and when they will obey them. Someone must exercise
> authority and control. One can quickly reason what would happen in a
> maximum security prison without proper discipline.

*Soto*, 744 F.2d at 1267 ("Inmates are and must be required to obey orders. When an

inmate refused to obey a proper order, he is attempting to assert his authority over a

portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.").

Plaintiff claims that Defendant Brown used excessive force against him when he sprayed a single burst of pepper spray at Plaintiff during the cell extraction on March 10, 2012. "In order to have a valid claim . . . the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002). Additionally, "a plaintiff must prove that a requisite amount of force was used against him." *Connell v. Tate*, 2012 U.S. Dist. LEXIS 9453, 2012 WL 252817, * 12 (M.D. Fla. Jan. 25, 2012) (citation omitted). The evidence viewed in the light most favorable to plaintiff must go "beyond a mere dispute over the reasonableness of the force used" and must "support a reliable inference of wantonness in the infliction of pain." *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir. 1987). The undersigned finds that Plaintiff has failed to carry his burden of proving the essential elements needed to state a claim of excessive force against Defendant Brown.

### 1.     Need for application of force.

There was an obvious need for the application of some force, despite Plaintiff's assertion that he ceased his unruly behavior at the exact moment Defendant Brown appeared at his cell. Plaintiff admitted that he repeatedly pressed the panic button to request a cell transfer in defiance of Defendant Brown's orders to stop, and Plaintiff had begun creating a larger and louder disturbance by kicking and banging on his cell door, undeterred by repeatedly warnings to stop. Experience has taught the Court that

> in a prison environment where dangerous inmates are housed and where visibility into individual cells is limited, . . . unremitting banging or yelling that an inmate refuses to stop upon order may be a 'disturbance' sufficiently serious as to require that it be quelled by the non-spontaneous use of force because it may, for example, incite other inmates to join in the ruckus or the noise may overwhelm another inmate's request for help. . . .

> [] [T]he use of chemical agents as a means of force against a recalcitrant prisoner who refuses to obey an order generally does not, in itself, violate the Eighth Amendment. *See Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) (holding in context of pretrial detainee's excessive force claim that the use of "pepper spray is an accepted non-lethal means of controlling unruly inmates" and that "[a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders").  This is true even though chemical agents, by their very nature, are "designed to disable a [person] by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx," and, occasionally, "disorientation, anxiety, and panic in the person sprayed." *Id.* at 1309 (citing cases). Thus, this degree of pain is constitutional because the effects are temporary- - or at least are intended to be.

*Thomas v. McNeil*, 2009 U.S. Dist. LEXIS 1208, *93, 2009 WL 64616 (M.D. Fla. Jan. 9, 2009) (Prison policy of utilizing spontaneous force, typically pepper spray, was found to be unconstitutional based on particular mental stability of inmates and their distinct incapacity to conform their conduct due to their mental illnesses).

> ## 2.      Relationship between the need and force used.

It is arguable the Defendant Brown may have been successful in extracting Plaintiff from his cell without the use of pepper spray, since Plaintiff appeared to be surrendering to Defendant's will, but a single burst of the chemical agent following an inmate's failure to comply with orders, combined with his escalating obtrusive behavior, is not the type of force that shocks the conscious or equates to an Eighth Amendment violation.  Veritably, the use of chemical agents, mace, or the pepper spray has been found not to violate the Eighth Amendment when its use is reasonable and necessary to prevent riots and to subdue recalcitrant prisoners. *Williams v. Benjamin*, 77 F.3d 756, 762-63 (4th Cir. 1996) (finding that the spraying of mace in the face and chest of a recalcitrant prisoner while in his cell did not constitute cruel and unusual punishment because he had been throwing water and refused to remove his arm from a

25

food service slot); *Soto v. Dickey*, 744 F.2d 1260, 1270-71 (7th Cir. 1984) (upholding the use of mace in a prisoner's cell because he refused to be handcuffed), *cert. denied*, 470 U.S. 1085, 105 S. Ct. 1846, 85 L. Ed. 2d 144 (1985); *Clemmons v. Greggs*, 509 F.2d 1338, 1340 (5th Cir. 1975) (ruling that there was no constitutional violation when mace was used during a disturbance because there was no intent to punish), *cert. denied*, 423 U.S. 946, 96 S. Ct. 360, 46 L. Ed. 2d 280 (1975); *Geas v. DuBois*, 868 F. Supp. 19, 24 (D. Mass. 1994) (ruling that "'the use of non-dangerous quantities of [a chemical agent] in order to prevent a perceived future danger does not' generally overstep constitutional parameters."); *Blair-El v. Tinsman*, 666 F. Supp. 1218, 1222 (S.D. Ill. 1987) (finding that officers acted reasonably when they sprayed a chemical spray into an inmate's cell to quell a disturbance); *cf. Ort v. White*, 813 F.2d 318, 324 (11th Cir. 1987) (relying on the decision in *Soto v. Dickey* in which chemical agents were used, to determine that the denial of water was an immediate, coercive measure, and not punishment).  It is only a "violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Soto*, 744 F.2d at 1270.  "A limited application of mace may be 'much more humane and effective than a flesh to flesh confrontation with an inmate.'" *Williams*, 77 F.3d at 763 (*quoting Soto*, 744 F.2d at 1262).

Defendant Brown was the officer on the scene and his judgment regarding his belief of the safety of the situation upon entering Plaintiff's cell and the need for some use of force to control Plaintiff should not be questioned merely because a different option may have existed.  *Danley*, 540 F.3d at 1307, *quoting Bennett*, 898 F.2d at 1533 ("When we consider whether the jailers' use of force was excessive, we must 'give a wide range of deference to prison officials acting to preserve discipline and security.'").

26

Courts recognize that corrections officials often must make decisions "'in haste, under pressure, and frequently without the luxury of a second chance.'" *Hudson*, 503 U.S. at 6 (citing *Whitley*, 475 U.S. at 320). Moreover, an inmate "is not at liberty to ignore or disobey, without consequence, the lawful orders of his custodians or the rules and regulations of a jail." *West v. Sconyers*, 2010 WL 4822084, *7 (M.D. Ala. 2010) (unpublished). "Strict adherence to rules and orders within a penal institution's walls are necessary for discipline, and even more importantly, for the safety and security of inmates, guards, and visitors alike." *Id.*

An examination of the force used in the context of the March 10, 2012 incident, reveals that Defendant Brown did not act maliciously or sadistically to cause harm to Plaintiff; instead, the burst of pepper spray was utilized to restore and maintain discipline and order. Defendant Brown had every reason to prepare for an obstinate and recalcitrant inmate when approaching Plaintiff in his cell, given that Plaintiff had participated in two inmate fights earlier in the day, had proceeded to disobey every command uttered by Brown, and was, in fact, becoming more rowdy as he had begun to kick at his cell door. The minor use of force after repeated disobedience by Plaintiff was proportional to the situation at hand. Brown used only a single short burst of pepper spray to assure he gained control of Plaintiff before attempting to remove him from his cell and transfer him to a restraint chair. *See Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary . . . to subdue recalcitrant prisoners does not constitute cruel and inhumane punishment" even if the inmate is handcuffed or locked in the cell). *Johnson v. Berezansky*, 2005 U.S. Dist. LEXIS 7552, *11 (D. Del., Apr. 28, 2005) (No Eighth Amendment violation where capstun was used "to stop inmate from causing a

disturbance in the prison through his continued shouting and banging on the cell door, and to address his lack of compliance with [an officer's] instructions."). There is no question that given Plaintiff's recalcitrant behavior, the initial use of force, the pepper spray, was a reasonable and good faith effort to maintain or restore discipline. *See Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) *overruled on other grounds by Randall v. Scott,* 610 F.3d 701 (11th Cir. 2010) (finding "pepper spray is an accepted non-lethal means of controlling unruly inmates").

### 3.    Extent of injury inflicted.

Following the administration of pepper spray, Plaintiff claims he experienced burning eyes and skin, temporary loss of vision, and temporary trouble breathing. (Doc. 1 at 7). These are the typical side effects of pepper spray. The post-spray suffering was temporary and *de minimis* which corresponds to the *de minimis* nature of the force used. The *de minimis* effects are further supported by the fact that Plaintiff was allowed to decontaminate himself and rinse off the chemicals as soon as was practically allowable,[21] when the shift change was complete.

### 4.    Extent of threat reasonably perceived.

Defendant Brown relied on his experience as an officer and his experience with

---

[21]    Plaintiff questions the efficiency and sanitation of the sink by claiming he was not allowed proper decontamination because he was made to use "a filthy mop closet." (Doc. 65 at 7). The description of an impure environment, while unpleasant, is not conclusive as to the effectiveness or ineffectiveness of his decontamination. The mere fact that the decontamination area did not appear sanitary, does not equate to a constitutional violation. There is no claim that the water used was polluted. Nor does Plaintiff claim the water was insufficient to cleanse his eyes and face. Instead, the facts depicted that the mop closet was likely the closest water source to Plaintiff's location. The lack of any allegations regarding the safety of the water source, leads the Court to reason that Plaintiff was given access to water to decontaminate himself following the single burst of pepper spray. Thus, the Court finds no proof of deliberate indifference on the part of Defendants.

Plaintiff to determine what amount of force was necessary for the situation.  And the Court recognizes that an officer entering Plaintiff's cell on March 10, 2012 could have perceived a dangerous situation, or at the least the need to protect oneself from an escalating situation.

As previously stated, Plaintiff had been transferred to the segregated housing unit due to two inmate fights he was involved in earlier in the day.  Plaintiff was then housed with an inmate he objected to and began causing a disturbance in order to influence a transfer to another cell.  After continued denials of his request to be moved, Plaintiff's tactics increased to physical annoyance by kicking his door.  Knowing this behavior can incite other inmates and aware that Plaintiff was become more aggressive, Defendant Brown acted to temper the situation and keep it from escalating further.  The undersigned relies on Defendant's discretion and experience and reasons that an officer's safety could be threatened by an inmate who is in disciplinary segregation for fighting with other inmates, an inmate who refuses to follow orders, and an inmate who becomes increasingly more belligerent, hostile, and insistent despite warnings of force being used against him.  When the threat of force does not curb an inmate from his unruly and disorderly conduct, the next step is to utilize some degree of force to maintain order and discipline in a high security cellblock.

### 5.    Efforts to temper the severity of the response.

Prior to using any force, Defendant Brown attempted to prevent and de-escalate the situation by talking to Plaintiff over the intercom and assuring Plaintiff that while he would not be moved to another cell, he would be checked on to ensure his safety. Defendant Brown also gave Plaintiff fair warning of the arising incident by cautioning him that failure to stop his behavior would necessitate the use of pepper spray on him

and placement in a restraint chair.  Defendant Brown did not burst into Plaintiff's cell unannounced or without provocation.  Therefore, the undersigned finds that Plaintiff has failed to carry his burden of showing any genuine issue of material fact remains, and his presentation of evidence on the claim for excessive force against Defendant Brown for administering pepper spray on him on March 10, 2012 is insufficient and cannot avoid summary judgment.

### c.    No excessive force violation for head shove.

Following the cell extraction, Plaintiff was handcuffed and taken to the "pod" area where officers are stationed.  The parties dispute whether or not any force was used against Plaintiff during his transfer from his cell to the restraint chair.  Plaintiff contends Defendant Brown "shoved" Plaintiff's head into the wall while he was handcuffed and stated, "do you like that Mother fucker?"  (Doc. 1 at 8).  To which Plaintiff responded, "yell[ing] loudly and clearly don't bang my head against the wall Bitch," to which Defendant Brown "again shoved Plaintiff's head into the wall and told Plaintiff to shut the Fuck up."  (*Id.*).  Inmate Cart affirms he witnessed the incident but gives a varied version of the incident, stating that while Defendant Brown was holding Plaintiff's arm escorting him to the pod area, Brown "shoved [Plaintiff] at the wall and [Plaintiff's] head hit the wall."  (Doc. 56-1 at 23).  Inmate Cart submits that Plaintiff looked angry and tried to pull away from Defendant and then Defendant Brown pushed Plaintiff's head into the wall.  (*Id.*).  Defendant Brown denies these allegations in their entirety.  (Doc. 34-3 at 5).  Notwithstanding the discrepancy regarding the facts, the Court will rely on Plaintiff's version coupled with Inmate Cart's, which Plaintiff submitted in support of his claim.

In *Hudson v. McMillian*, the Supreme Court rejected the theory that an inmate

30

who alleges excessive use of force is required to show serious injury in addition to

unnecessary and wanton infliction of pain.  503 U.S. 1, 10 (1992).

> In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident. . . . That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind."

*Id*. at 8-10 (internal quotations and citations omitted); *see also Johnson v. Glick*, 481 F.2d at

1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a

judge's chambers, violates a prisoner's constitutional rights").  Thus, the relevant

inquiry under the objective prong of *Hudson* is whether the alleged wrongdoing, in this

case a head shove into the wall, was objectively harmful enough to establish a

constitutional violation?  *See id*. at 8 (In *Hudson* the Court found injuries of bruises,

swelling, loosened teeth, and a cracked dental plate were not *de minimis*.).  Additionally,

while words alone are not determinative of bad faith on the part of officers in their use

of force, they may be relevant "as part of the totality of the totality of the circumstances"

in determining an officer's state of mind.  *Bozeman v. Orum*, 422 F.3d 1265, 1271 n.11

(11th Cir. 2005).

    The claims in this action closely mirror a number of other cases from the

Eleventh Circuit in which the use of force was found to fall short of a constitutional

violation.  *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990) (inmate's claim that two

guards grabbed by the throat and struck him with a night stick after verbal dispute);

*Brown v. Smith*, 813 F.2d 1187 (11th Cir. 1987) (guard not liable for putting riot baton

against neck of inmate and pinning inmate against cell for refusing to enter cell when

ordered despite claim of serious injury by inmate); *Fischer v. Ellegood*, 238 F. App'x 428
(11th Cir. 2007) (prisoner's allegation that he was pepper sprayed for not following
orders during a shakedown); *Enriquez v. Landers, et al.*, No. 2:02-cv-510-FtM-VMC-SPC,
2005 U.S. Dist. LEXIS 21718, 2005 WL 2405829 (M.D. Fla. Sept. 29, 2005) (inmate
claiming unprovoked attacks leaving him with bruising and abrasions was *de minimis*
injury suggesting *de minimis* force not sufficient to prove an Eighth Amendment
violation); *Springs v. Lagravinese*, No. 2:07-cv-522-FtM-29DNF, 2008 U.S. Dist. LEXIS
39486, 2008 WL 2074415 (M.D. Fla. May 15, 2008) (inmate who was grabbed by the arm,
had it twisted behind him and was shoved into his cell did not support a finding
malicious and sadistic purpose); *Hall v. Leavins*, No. 3:06cv351/RV/EMT, 2009 U.S. Dist.
LEXIS 82582, 2009 WL 2905912 (N.D. Fla. Aug. 18, 2009) (inmate who was choked,
shoved and slammed to the floor does not evidence more than *de minimis* force);
*Robinson v. Davis*, No. 3:06cv403/RV/EMT, 2008 U.S. Dist. LEXIS 111862, 2009 WL
153162 (N.D. Fla. Dec. 23, 2009) (shoving shackled inmate to the ground, resulting in
injury and abrasions to inmate's knee, ankle and toe was *de minimis* use of force and
insufficient under the Eighth Amendment standard); *Jones v. City of Dothan*, 121 F.3d
1456, 1460-61 (11th Cir. 1997) (officers slammed man against a wall, kicked his legs
apart, forced him to raise his hands above his head; man suffered pain from raising
hands due to prior stroke, and from kicking due to arthritic knees, and received medical
treatment for knees thereafter; although force was unnecessary, force used and injury
inflicted were minor, and excessive force standard would not inevitably lead officer to
conclude that force was unlawful, thus officer entitled to qualified immunity); *Post v.
City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (pushing handcuffed individual
against a wall, although unnecessary, was not plainly unlawful, and officer entitled to

qualified immunity because "it was not clearly established that the amount of force he used . . . was unlawful.").[22]

Although Defendant Brown arguably could have used less force in escorting Plaintiff to the restraint chair, Plaintiff has failed to produce evidence showing that Brown took measures "maliciously and sadistically for the very purpose of causing harm." *See Hudson*, 503 U.S. at 6, 112 S. Ct. at 998; *see also Campbell*, 169 F.3d at 1374 (explaining that "force does not violate the Eighth Amendment merely because it is unreasonable or unnecessary").  In fact, Plaintiff's own evidentiary support suggests that use of force was appropriate based on the circumstances.  Specifically, it appears that the first time Plaintiff's head hit the wall it was unintentional.  Inmate Cart's statement references Plaintiff being held by his arm and Plaintiff's body being shoved toward the wall, where Plaintiff's head happened to contact the wall.  Cart then avers that, "Plaintiff looked angry and tried to pull away from Defendant."  Plaintiff also admits cussing at Defendant Brown.  Cart states, thereafter, Defendant Brown shoved Plaintiff's head into the wall.  Any resistance or noncompliance on the part of Plaintiff during his movement from his cell to the restraint chair would open the door for some force to be used.  It is not difficult to ascertain the potential threats that could arise when a single officer escorts an inmate alone throughout the jail.  Taking Plaintiff's facts as true, the amount of force used, even if deemed more than necessary in hindsight, occurred during the process of Defendant's duties of moving a disobedient, insubordinate inmate for the purpose of maintaining order and discipline at the jail.  *See Kendrick v. Faircloth*, No. 8:08-cv-1892-T-33TGW, 2010 U.S. Dist. LEXIS 3908, * 21 (M.D.

---

[22]    "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

Fla. Jan. 19, 2010) (Being forcefully pushed into a holding cell wall "was not so grossly disproportionate or unrelated 'to the task at hand' to suggest the type of malicious or sadistic purpose required" to state a constitutional excessive force claim.).

The language purportedly used by Brown is without a doubt inappropriate and raises questions as to Defendant's subjective intent; however, Plaintiff fails to prove the objective element of his claim.  Notably, Plaintiff received no injuries due to the alleged force.  And while the Court is aware that excessive force may exist without a severe injury, the lack of *any* sustained trauma is suggestive and likely corresponds to the amount of force used.  Plaintiff does not complain of tortuous acts that are designed to inflict pain but leave no trace of suffering; instead, Plaintiff complains of his head being shoved into a wall (likely a concrete wall).  This type of force produces obvious signs of injury - even the mere act of bumping one's head into a wall often produces bruises or soreness.  Yet, Plaintiff suffered no bruises or swelling.  He neither requested nor required any medical treatment.  The Court finds the alleged actions of Defendant Brown to be unprofessional, but they do not rise to the level of a constitutional violation of excessive force.  In this action, the lack of *any* injury sustained by Plaintiff corresponds directly with the *de minimis* force used by Defendant Brown.  *Hudson*, 503 U.S. at 10 ("The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force . . .").  Accordingly, Plaintiff has not presented this Court with sufficient evidence to meet his burden and Defendant Brown is entitled to summary judgment.

> **d.     No excessive force violation for use of restraint chair.**

Plaintiff failed to heed the warning from Defendant Brown on March 10, 2012, that if he did not cease pressing the panic intercom button and banging on his cell door,

he would be sprayed with pepper spray, removed from his cell, and placed in a restraint chair.  Therefore, Defendant Brown proceeded in carrying out this plan of discipline.  However, Plaintiff complains that he never resisted Defendant Brown and that force was used on him for "no reason."  (Doc. 65 at 17).

The record evidences that Plaintiff's placement in the restraint chair was for the sole purpose of maintaining and restoring discipline.  *See Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (Any force used against in inmate must be used "'in a good faith effort to maintain or restore discipline" and not "maliciously and sadistically to cause harm."); *Lumley v. City of Dade City*, 327 F.3d 1186, 1196 (11th Cir. 2003) (The force used must not "shock the conscience.").  Plaintiff was repeatedly warned that he would be placed in the restraint chair if he failed to follow Defendant Brown's orders to stop pressing the panic intercom button and kicking his cell door.  Although Plaintiff was not allowed to decontaminate immediately after pepper spray was administered and prior to being placed in the restraint chair, any failure in this regard was not for the sadistic purpose of punishing or causing harm to Plaintiff.  *See Farmer*, 511 U.S. at 834 (quotation and citation omitted) (The necessity of proving a sufficiently culpable state of mind "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'").

The entire incident occurred just prior to one of the daily shift changes of officers. It is standard policy at BCCC that all inmates must be locked down at the time officers change shifts.  (Doc. 34-3 at 5).  Therefore, Plaintiff was forced to forgo decontamination until the completion of the shift change, but was decontaminated and given a clean

35

uniform following the shift change and replaced in the restraint chair.[23]  (*Id*.).  The

restraint chair straps were examined by a member of the medical staff to assure their

tension, Plaintiff was released from the chair, every two to four hours, to use the

bathroom, and released every one and a half to two hours to stretch his body.  (*Id*. at 6).

Additionally, Plaintiff remained in the chair for the standard amount of time provided

by BCCC policy.[24]  (*Id*.).  And although Plaintiff argues his calm behavior while

restrained should have been sufficient for immediate release from the chair, or negated

his ever being placed in the chair, the regulations of BCCC were followed and are

constitutional.  *See Smith v. McNesby*, No. 3:05cv410/MCR, 2007 U.S. Dist. LEXIS 83520,

*94 (N.D. Fla. Sept. 28, 2007) (Subjective prong not satisfied to show defendant acted

with "sufficiently culpable state of mind" by restraining plaintiff or "by failing to

hourly consider [plaintiff] for release from the chair."); *Fuentes v. Wagner*, 206 F.3d 335,

345 (3rd Cir. 2000) (Defendants "were not 'deliberately indifferent' to [plaintiff's] health

or well-being in employing the restraint chair."); *Pugh v. Evans*, No. 5:11-CT-3239-D,

2012 U.S. Dist. LEXIS 185014 (E.D. N.C. June 20, 2012) (No constitutional violation in

use of restraint chair following plaintiff's repeated use of the intercom system for non-

---

[23]     Plaintiff contends, however, he was not allowed to decontaminate himself in a proper shower but instead was forced to use a "a filthy mop sink in a janitor's closet." (Doc. 65 at 7).  Taking Plaintiff's facts as true, the Court cannot find a constitutional claim given that Plaintiff does not argue any pain or suffering that would implicate an Eighth or Fourteenth Amendment violation.  He never complains of the symptoms lasting on his body or for how long he felt side effects.  Instead, Plaintiff contends, "while restrained in the chair plaintiff was calm and subordinate and even was allowed to walk around on a break and conversed with Sanders and Ashberry about his life and family and about Jesus too."  (Doc. 65 at 7).  This description of Plaintiff hardly qualifies as someone suffering from cruel and unusual punishment at the hands of jail officers.

[24]     Defendants further assert that restraint chairs at BCCC are not used for punishment; rather they "are only utilized when an inmate threatens physical harm to themselves [sic], Corrections Center staff or another inmate."  (Doc. 34-4 at 6).

emergencies).  The proper protocol was followed regarding usage of the chair, and Plaintiff's original unruly and disobedient behavior necessitated appropriate force to restore order to the chaos created by Plaintiff.  Courts show great latitude to the discretion of prison officials in inmate management.  *See Bell v. Wolfish*, 441 U.S. at 547, 99 S. Ct. at 1878.  Therefore, finding that the use of the restraint chair was constitutional, summary judgment should be granted in favor of Defendant Brown.[25]

**Claim 3:        No excessive force used on April 13, 2012.**

Plaintiff claims Defendants Keers, Rowell, and Boyington are liable for using excessive force against him on April 13, 2012 when they administered pepper spray in his cell for the purpose of gaining control of Plaintiff's unruly cellmate and then denied Plaintiff the opportunity to change his clothing, bedding, or clean his contaminated cell. (Doc. 1 at 12).  Plaintiff further claims that Defendants Aldrete and McNeal violated his constitutional rights by: (1) demanding that Plaintiff "lockdown" in a chemically contaminated cell, (2) denying Plaintiff the opportunity to decontaminate the pepper spray from his face and clothes, and (3) denying Plaintiff's request to be released from the restraint chair to use the restroom, causing Plaintiff to urinate on himself.  (*Id.* at 12-13).

---

[25]        Even if the Court could reason that Plaintiff should have been released earlier from the restraint chair based on his good behavior, Defendant Brown would be protected by the doctrine of qualified immunity.  There is no Supreme Court or Eleventh Circuit precedent quantifying the amount of time a prisoner may be held in restraints.  *See Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2002) ("[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.")(citation omitted)). *Smith v. McNesby*, No. 3:05cv410/MCR, 2007 U.S. Dist. LEXIS 83520, *94 (N.D. Fla. Sept. 28, 2007) (Subjective prong not satisfied to show defendant acted with "sufficiently culpable state of mind" by restraining plaintiff or "by failing to hourly consider [plaintiff] for release from the chair.").

> [O]nly a use of force that "is physically barbarous [or] involv[es] . . . the unnecessary and wanton infliction of pain or the imposition of pain totally without pen[o]logical justification" violates due process. S*ee Evans v. Dugger*, 908 F.2d 801, 803 (11th Cir. 1990). Stated otherwise, the plaintiff must show that the defendant's conduct "shocks the conscience." *Lumley*, 327 F.3d at 1196; Hope, 536 U.S. at 738 (finding that subjecting prisoner to being tied to outdoors hitching post in heat of day without water or access to a toilet for seven hours violated the Eighth Amendment). To be sure, the conduct at issue must "offend even hardened sensibilities" and implicate only the "most egregious official conduct." *Carr v. Tatangelo*, 338 F.3d 1259, 1271, n. 23 (11th Cir. 2003). The court may consider several factors in gauging the legitimacy of the use of physical coercion in a given situation, including "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Skrtich*, 280 F.3d at 1300 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7-8, 112 S. Ct. 995, 117 L.Ed.2d 156 (1992)). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321 (quotation omitted).

*Smith v. McNesby*, No. 3:05cv410/MCR, 2007 U.S. Dist. LEXIS 83520, *80-82 (N.D. Fla. Sept. 28, 2007).

Generally, the internal security of a prison is left to the discretion of prison officials. *Whitley*, 475 U.S. at 321, 106 S. Ct. at 1085. However, this deference to prison officials carries special weight when measures are taken in response to riotous inmates or are taken prophylactically to reduce such incidences or breaches in discipline. *Id.* at 321-22, 106 S. Ct. at 1085. Actions taken by prison officials to quell unrest and conflict or "prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline" are to be accorded wide-ranging deference. *Id.* These situations usually require that prison officials make decisions "in haste, under pressure, and frequently without the luxury of a second chance." *Id.* at 320, 106 S. Ct. at 1084. Therefore, "'prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are

needed to preserve internal order and discipline and to maintain institutional security.'"
*Id.* at 322, 106 S. Ct. at 1085 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S. Ct. 1861, 1878, 60 L. Ed. 2d 447 (1979)). This deference requires that neither judge nor jury freely substitute their judgment for that of officials who have a made considered choice. *Whitley*, 475 U.S. at 322, 106 S. Ct. at 1085. However, actions taken in bad faith or for no legitimate purpose are not insulated from review. *Whitley*, 475 U.S. at 322, 106 S. Ct. at 1085.

The Court turns to the allegations against Defendants Keers, Rowell, and Boyington. On April 13, 2012, Defendants found it necessary to control an escalating behavior problem. Inciting the disruption was Plaintiff's unruly cellmate, Brent Jacoby. Jacoby had been ordered to cease his yelling and banging on the cell door; warned of the consequences for failing to obey, Jacoby continued to ignore the officers' commands. Following BCCC policy, Defendants entered Plaintiff's cell with the task of restoring discipline and order and preventing further disorderly conduct in the segregated housing unit. Defendants' plan to execute a forceful extraction of Jacoby was not sudden or unknown to Plaintiff. In fact, Plaintiff was prepared for Defendants and anticipated the forceful extraction, evidenced by Plaintiff wrapping a t-shirt around his head to cover his face from the impending administration of pepper spray. And while the Court agrees with Plaintiff's claim that under calm and perfect circumstances, innocent bystanders should not have to endure any potential contact with chemical agents and should be allowed to exit a jail cell prior to the administration of pepper spray, such idyllic conditions rarely exist in a jail or prison setting and are practically unfathomable in a scenario where an inmate is yelling, screaming and banging on his cell door – like the case at hand.

39

In this action, Defendants were attempting to gain control over a hostile inmate, who unfortunately was housed in Plaintiff's cell.  The need to use force, however, is readily observable based on the facts of this action.  And the amount of force used was also clearly constitutional, as the pepper spray was administered only until officers were amble to secure Jacoby in handcuffs.  *See Williams v. Benjamin*, 77 F.3d 756, 762-63 (4th Cir. 1996) (finding that the spraying of mace in the face and chest of a recalcitrant prisoner while in his cell did not constitute cruel and unusual punishment because he had been throwing water and refused to remove his arm from a food service slot); *Soto v. Dickey*, 744 F.2d 1260, 1270-71 (7th Cir. 1984) (upholding the use of mace in a prisoner's cell because he refused to be handcuffed), *cert. denied*, 470 U.S. 1085, 105 S. Ct. 1846, 85 L. Ed. 2d 144 (1985); *Clemmons v. Greggs*, 509 F.2d 1338, 1340 (5th Cir. 1975) (ruling that there was no constitutional violation when mace was used during a disturbance because there was no intent to punish), *cert. denied*, 423 U.S. 946, 96 S. Ct. 360, 46 L. Ed. 2d 280 (1975); *Geas v. DuBois*, 868 F. Supp. 19, 24 (D. Mass. 1994) (ruling that "'the use of non-dangerous quantities of [a chemical agent] in order to prevent a perceived future danger does not' generally overstep constitutional parameters."); *Blair-El v. Tinsman*, 666 F. Supp. 1218, 1222 (S.D. Ill. 1987) (finding that officers acted reasonably when they sprayed a chemical spray into an inmate's cell to quell a disturbance); *cf. Ort*, 813 F.2d at 324 (relying on the decision in *Soto v. Dickey*, *supra*, in which chemical agents were used, to determine that the denial of water was an immediate, coercive measure, and not punishment).  It is only a "violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Soto*, 744 F.2d at 1270. "A limited application of mace may be 'much more humane and

40

effective than a flesh to flesh confrontation with an inmate.'" *Williams*, 77 F.3d at 763 (quoting *Soto*, 744 F.2d at 1262).

Also, given that Plaintiff had previously been forcefully extracted from his cell in the past, he was familiar with the practice, forewarned that it was about to occur, and, therefore, the Court finds he had ample opportunity to get as far away from Jacoby as possible within the confines of the cell before the extraction team arrived.  Although Plaintiff claims pepper spray was sprayed on him intentionally by Defendant Rowell, he fails to provide any details indicating Defendant Rowell's subjective intent to maliciously cause him harm.  Defendant Rowell used no language to signify he was purposefully administering pepper spray in Plaintiff's direction.  There is no mention that Defendant Rowell looked up and aimed the spray directly at Plaintiff.  In sum, there are no facts suggesting Defendant Rowell took any actions mimicking a desire or intent to spray Plaintiff with pepper spray directly.  Therefore, while the Court takes Plaintiff's statement as true that he was sprayed with pepper spray, Plaintiff fails to provide the needed element of Defendant Rowell's subjective intent to cause harm to Plaintiff that would dictate a constitutional violation.

Additionally, Plaintiff fails to articulate any suffering due to his exposure to pepper spray that is not common to chemical sprays; he does not claim that he needed or requested medical treatment, nor does he indicate how long his symptoms may have lasted.  (*See* Doc. 65 at 24-30).  But, Plaintiff does state, "that once he was removed from the dorm the effects [of the pepper spray] had subsided except for the burning skin and eyes." (Doc. 65 at 30).  The Court further reasons that the clothing Plaintiff was wearing, the t-shirt he had tied around his face, and the distance from which he was

located from Defendant Rowell when the spray was administered must have tempered the complained-of symptoms from the typical heightened responses. Furthermore, the record is clear that Plaintiff was immediately let out of the cell once control was gained over his cellmate, was given cleaning supplies to decontaminate his cell (even if he disagreed with the efficacy of the cleaning solution), and was instructed to remove any contaminated items from his cell and place them outside his door. Therefore, given the totality of the circumstances, the undersigned finds that Defendants' acted "in a good-faith effort to maintain or restore discipline," *Hudson*, 503 U.S. at 7, and unfortunately, Plaintiff was caught in the middle of the disturbance created by his cellmate.

While this circumstance evidences an institutional dilemma and complication of the system of incarceration, Plaintiff has failed to carry his burden of proving the needed elements of his claim. He presented no evidence that Defendants entered his cell "maliciously and sadistically to cause harm" to him. *Hudson v. McMillian*, 503 U.S. 1, 7-8. And neither the act of spraying Jacoby while Plaintiff remained in the cell or the temporary effects of pepper spray complained of by Plaintiff are objectively "'harmful enough'" to establish a constitutional violation. Therefore, Defendants Keers, Rowell, and Boyington are entitled to summary judgment on this claim.

     **a.     Ordered to lockdown in contaminated cell.**

Following the use of pepper spray in Plaintiff's cell, Plaintiff was given approximately 15 (fifteen) minutes prior to the time of lockdown during the officers' shift change to allow his cell to air out while he remained in the day room, to clean his cell with a mop and water, and to place any contaminated items outside his cell. Plaintiff contends the odorous fumes of the pepper spray lingered in the cell to such an

extent that he "could not breathe and he would start coughing" upon entering the cell; therefore, Plaintiff did not decontaminate his cell as instructed. (Doc. 65 at 25).  Plaintiff admits disobeying Defendant Aldrete's and Defendant McNeal's orders to lockdown in his cell but justifies his disobedience by arguing he should not have been commanded to reenter the chemically-contaminated cell.  He further argues that to require him to lockdown in the chemically-contaminated cell was a violation of his rights guaranteed under the Eighth Amendment.  With respect to placing an inmate in a cell that has not been adequately decontaminated after the use of a chemical agent, the Court notes that such situations may pose an unreasonable risk to an inmate's health that is serious enough to trigger inquiry under the Eighth Amendment.  *See Danley v. Allen*, 540 F.3d 1298, 1311 (11th Cir. 2008).  However, even if Plaintiff were able to satisfy the objective prong of a conditions of confinement claim with respect to exposure to an un-decontaminated cell, he has not alleged facts sufficient to satisfy the subjective prong, *i.e.*, that any Defendant knew of, yet disregarded, a substantial risk of harm to Plaintiff by ordering Plaintiff to return his cell prior to proper decontamination.  As presented, therefore, Plaintiff has not stated a claim for relief.

The facts presented by Plaintiff evidence that Plaintiff refused to obey Defendants' commands to reenter and lockdown in his cell and became verbally combative, including "scream[ing], cuss[ing], and yell[ing] that he would not lockdown." (Doc. 65 at 26).  Most importantly in failing to carry his burden of proving Defendants' subjective intent, Plaintiff states that Defendants Aldrete and McNeal did not "even investigate the condition of plaintiff[']s cell, but just assumed he was lying [about the odorous fumes]." (Doc. 65 at 27).  Plaintiff reiterates the non-presence of Defendants when he explains that "[a]fter talking to a mic/speaker box and getting

43

frustrated at the situation plaintiff started yelling, cussing, and screaming because McNeal and Aldrette [sic] starting yelling at him first and were intentionally trying to make him go into the cell that [was] harmful to him even after plaintiff told them of the danger." (Doc. 65 at 26).  Given that Defendants Aldrete and McNeal were not the officers who administered the pepper spray in Plaintiff's cell, they had no personal knowledge regarding the amount of spray dispensed or of fumes remaining in the cell. But what Defendants did know was that Plaintiff had a mop bucket, a mop, and 15 minutes to clean his cell and remove any contaminated items, and Defendant Aldrete had "reminded Plaintiff he would be provided with clean bedding, towels and a uniform after lockdown," and "Plaintiff continuously refused to go into his cell and continued to scream." (Doc. 34-1 at 4).  Therefore, it is clear based on Plaintiff's submissions, that Defendants, who arguably should have inspected Plaintiff's cell prior to ordering his reentering, were not deliberately indifferent to Plaintiff.  The evidence shows Defendants were not aware that chemical toxins remained in Plaintiff's cell, nor did they draw the inference that returning to his cell could possibly harm Plaintiff. Thus, Defendants Aldrete and McNeal cannot be liable for a constitutional violation against Plaintiff for attempting to hold him in a cell containing residual pepper spray.

    **b.**    **Restrained in Chair.**

    As discussed above, Plaintiff refused multiple orders to lockdown in his cell. Additionally, Plaintiff became combative, argumentative, and disruptive by yelling, cursing, and screaming that he would not lockdown as ordered and "was not going into his cell." (Doc. 65 at 28).  Defendants ultimately secured Plaintiff and placed him in a restraint chair due to his hostile behavior and failure to follow orders.  Plaintiff alleges placing him in the restraint chair for approximately eight hours without

44

decontaminating him or giving him clean clothes was excessive force in violation of his constitutional rights.

1. <u>The need for the application of force.</u>

The Court finds Plaintiff's refusal to lockdown was a deliberate challenge to the authority of Defendants and presented a major safety concern for officers and other inmates. Defendants Aldrete and McNeal were not arbitrarily ordering Plaintiff to his cell. Rather, it time for shift change for the officers and it is the policy at BCCC to have every inmate in lockdown at the time of a shift change, with the limited exception of emergencies. This procedure ensures the safety of inmates and officers and is necessary to the administration of the facility. An inmate "is not at liberty to ignore or disobey, without consequence, the lawful orders of his custodians or the rules and regulations of a jail." *West v. Sconyers*, 2010 WL 4822084, *7 (M.D. Ala. 2010) (unpublished). "Strict adherence to rules and orders within a penal institution's walls are necessary for discipline, and even more importantly, for the safety and security of inmates, guards, and visitors alike." *Id.* Thus, Defendants were reasonable in their decision to place Plaintiff, a disorderly inmate and momentary safety hazard, in a restraint chair.

2. <u>The relationship between the need and the amount of force used.</u>

There is no *per se* constitutional issue in the use of restraint chairs for uncontrollable inmates or inmates who present safety concerns. Constitutional violations involving restraint chairs typically arise due to the conditions of the holding or the length of restraint periods. *See Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) ("How long restraint may be continued calls for the exercise of good judgment on the part of prison officials."). "Once it is established that the force was applied in a good faith effort to maintain discipline and not maliciously or sadistically for the

purpose of causing harm, the courts give great deference to the actions of prison officials in applying prophylactic or preventive measures." *Id*.  "[F]ederal courts must defer in many matters to the expert judgment of these administrators, particularly in matters of internal security and order." *Id*.

Plaintiff argues that he should not have been restrained in the chair after his refusal to obey Defendants' orders to lockdown and claims that it violated his constitutional right as a pretrial detainee to be restrained in the chair without first having the pepper spray—administered 15 to 20 minutes earlier—washed off his body. If Plaintiff were denied decontamination for the mere purpose of inflicting pain or injury, the Defendants would be liable for a constitutional violation pursuant to this § 1983 action.  However, the Court finds no evidence in the record, including any averments of fact  from Plaintiff that he requested medical attention or complained to an officer of the effects of the chemical spray prior to being placed in the restraint chair. In fact, there is no evidence suggesting Defendants Aldrete and McNeal were aware of any harm or suffering to Plaintiff; therefore, it is impossible to find that Defendants were deliberately indifferent to Plaintiff's suffering and denied him decontamination prior to placing him in the restraint chair for the purpose of causing harm to him.[26]

---

[26]     The record shows Defendants communicating with the Plaintiff through the facility's intercom system.  The conversations center on Plaintiff's vocal refusals to lockdown, which escalated to screaming and yelling.  It defies reasoning that an inmate suffering from sever chemical toxins would be capable of remaining in a day room for upwards of 15 minutes without requesting, much less badgering, an officer to get him a shower or medical attention.  This theory is further corroborated by the fact that Plaintiff was able to carry on conversations and capable of yelling and screaming at Defendants when refusing to lockdown.  It is difficult to imagine that an individual who is having trouble breathing would be able to communicate efficiently, much less yell and scream.  There is no evidence before the Court that Defendants acted "maliciously and sadistically to cause harm," only that they used necessary force to subdue an inmate who would not obey their commands. *Hudson*, 503 U.S. at 6-8.

46

Without a determination of deliberate indifference on the part of Defendants, the Court sides with other cases in this circuit with similar facts finding no constitutional violation where inmates were sprayed with pepper spray and thereafter restrained. *See Scroggins v. Davis,* 346 F. App'x 504 (11th Cir. 2009) (finding no constitutional violation where inmate was sprayed with OC spray, held in four-point restraints for over three hours, and then placed in a small holding cell without being decontaminated because there was no evidence of a serious risk of harm); *Williams v. Burton*, 943 F.2d 1572 (11th Cir. 1991) (finding no constitutional violation where inmate was gagged and restrained, even after being subdued, for over 28 hours because of deference to prison officials, inmate's past behavior, and the attention that was given, including medical assessments, to inmate during the restraint period); *Stanfill v. Talton*, 851 F.Supp.2d 1346 (M.D. Ga. 2012) (finding inmate's continued restraint due to the risk of harm he posed to himself and others was proper, despite inmate's death while restrained); *Styron v. City of Foley*,  CA No. 03-0572-CG-L, 2005 U.S. Dist. LEXIS 30076, 2005 WL 3098926 (S.D. Ala. Nov. 18, 2005) (finding no constitutional violation where inmate's delay in decontamination of pepper spray posed no serious risk of harm); *cf. Nasseri v. City of Athens*, 373 F. App'x 15 (11th Cir. 2010) (summary judgment reversed where plaintiff was placed in unventilated patrol car, without decontamination of pepper spray, and suffered documented respiratory problems from the incident); *Williams v. Benjamin*, 77 F.3d 756 (4th Cir. 1996) (dismissal on summary judgment was not found to be proper where plaintiff was sprayed with OS spray and placed in four-point restraints, without decontamination, use of toilet, or medical attention for eight hours, *and* was forced to inhale the fumes of the spray).

      Furthermore, Plaintiff continued to be disorderly and belligerent while

restrained in the chair by yelling at the officers, telling one officer he hoped his wife and children were raped, (Doc. 34-5 at 4), cussing, and begging to be released.  Plaintiff states he was unruly because his requests to properly decontaminate himself and receive a new uniform were ignored.  (Doc. 65 at 28-29).  Defendants contend, on the other hand, Plaintiff's protests centered on the condition of his cell and the presence of chemical fumes remaining therein and aver that Plaintiff did not voice a single complaint regarding pepper spray on his person and his need to decontaminate his body.  (Doc. 34-1 at 6).  Notwithstanding this factual discrepancy, the record is sufficient to determine that the force used to control Plaintiff was not unconstitutional, but was implemented to maintained discipline and control because Plaintiff had become insolent and out-of-control. Moreover, and important to the *Whitley* factors when determining whether or not force was legitimately used in a custodial setting, the fact that Plaintiff sustained no injury or actual damage from the incident – even if, as Plaintiff describes, he was not adequately decontaminated prior to being placed in the restraint chair is telling.

    3.  The extent of injury inflicted.

Plaintiff fails to plead or prove any physical injury from being restrained in the chair for eight hours.  Plaintiff articulates one effect from the force used on him – burning.  This sole complaint of burning is a typical physical response to exposure to pepper spray, which was used in a good faith effort to restore discipline in this case.  In the instant action, Plaintiff was not the intended recipient of the spray, was clothed in a uniform at the time the spray was deployed, and also had his face covered/masked with a t-shirt at the time the spray was deployed.  These factors would all sufficiently diminish the severity of the effects the pepper spray, as research shows that OC spray

does not persist on clothing or affected areas.[27]  Furthermore, Plaintiff fails to even state that he needed or sought medical treatment following the incident, nor does he state details of when his symptom of burning ceased or identify a lasting effect from the spray or restraint chair.  Therefore, the Court finds the burning discomfort felt by Plaintiff while restrained was temporary, which is supported by Plaintiff's lack of physical injury.

    4.  The threat to the safety of staff and inmates reasonably perceived.

    As stated previously, the BCCC regulation to lockdown every inmate at shift change is strictly adhered to for the safety of inmates and officers.  And, an inmate who disobeys orders is a potential threat to officers.  The combination of Plaintiff's disobedience and the timing thereof, coupled with his raging hostility to Defendants, equals a dangerous and threatening situation.  Defendants aver that when they approached Plaintiff in the day room to gain control of him, Plaintiff threw the mop bucket in their direction (causing water to spill across the floor), held the mop up and appeared to use it as a weapon, and stated to the officers, "come get me."  While Plaintiff denies holding the mop as a weapon and stating, "come get me," he does not dispute that he refused all orders to lockdown, that he verbally resisted being placed in

---

[27]    Moreover, research shows that "OC [,pepper spray,] will not persist on clothing or affected areas."  National Institute of Justice, *Evaluation of Pepper Spray*, February 1997, *available at* https://www.ncjrs.gov/txtfiles/162358.txt.  Also, OC spray requires "[n]o special decontamination protocols . . . because it is biodegradable . . . Unlike [other] irritants, OC will not persist on clothing or affected areas. . . . Finally, OC use does not result in dermatitis, skin depigmentation, or burns."  George Gkeneralis, *Health Consequences of Large Scale Use of Tear Gases and Other Chemical Substances in Mass Gatherings as a Means for Law Enforcement*, 7 (2012), http:crisis.med.uoa.gr/elibrary/6.pdf.  These findings support the conclusion that Plaintiff did not, in fact, suffer any long term effects from being placed in the restraint chair without a full body decontamination after the usage of pepper spray on his person.

the restraint chair, that medical personnel checked the safety tension of the straps on the chair once he was restrained, or that he continued to be belligerent once restrained. Plaintiff also does not dispute that while restrained he told Defendant McNeal, "I'm suing you," and Defendant Keers, that he "hoped [Defendant Keers'] wife and kids get raped." (Doc. 34-5 at 3-4; Doc. 40-2 at 4). Based on Plaintiff's combative behavior, it is obvious that Plaintiff was defiant, angry, and unruly. The use of a restraint chair is not objectively unreasonable, and there is no evidence that Defendants used the restraint chair in a manor to deliberately cause Plaintiff pain or suffering. The evidence before the Court suggests that Defendants placed Plaintiff in the restraint chair in a good faith effort to maintain and restore discipline and control to Plaintiff and the housing unit.

     5.  Any efforts made to temper the severity of a forceful response.

     Plaintiff's behavior prior to and during the incident in question evidenced resistance, aggression, and belligerence toward Defendants. Defendants did not use force against Plaintiff unprovoked or without justification. Defendants initially ordered Plaintiff to lockdown in his cell, which Plaintiff refused numerous times. The situation escalated to yelling and screaming between the parties. Ultimately, Defendants and other officers were obligated to resort to force to control Plaintiff and the situation. However, Defendants limited the force used by not deploying the FN303 pepper ball gun that was brought into the day room by Sergeant Graves. Instead the minimal amount of force was used to subdue Plaintiff and restrain him in the chair.

     In total, the Court finds that Defendants managed to gain control of Plaintiff and an escalating situation with minimal force. There is no evidence that Plaintiff required any medical attention for the effects of the disbursed pepper spray deployed earlier in Plaintiff's cell. Furthermore, there is no evidence that prior to being placed in the

restraint chair that Plaintiff notified Defendants of his need to be decontaminated. From the facts in the record, Plaintiff appeared to be suffering very little, if at all, from the residual pepper spray.  Also void in the record is any proof or indication of deliberate indifference on the part of Defendants toward Plaintiff.  The Court finds that Defendants acted in a good faith effort to maintain and restore discipline and control after Plaintiff vehemently refused to comply with given orders.  Thus, summary judgment should be granted to Defendants Aldrete and McNeal on the excessive force claims brought against them in this action.

      **c.**    **Denied request to use the toilet while restrained in chair.**

Plaintiff's final claim against Defendants Aldrete and McNeal is that, despite his repeated requests to use the toilet, he was not released from the restraint chair and was forced to urinate on himself.  While denial or restricted access to a toilet may be opposed to civilized standards of today's society, *see Farmer*, 511 U.S. at 834 (The deprivation to plaintiff must be objectively "serious," and "the denial of 'the minimal civilized measure of life's necessities[.]'")( quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)), it is an insufficient allegation *in this action* to support the claim asserted against Defendants Aldrete and McNeal.

In this action, Plaintiff details that while restrained in the chair he requested several times to be released from the chair to use the toilet.  Plaintiff states he, "was literally raising Hades about needing to pee and became hostile and very vocal when he could no longer hold it and urinated on himself[, but] *Cpl. Johnson* and *Officer Morse* said they needed permission from the Sargeant to let [him] pee, but were not authorized to let [him] yet."  (Doc. 65 at 31) (emphasis added).  It is clear from Plaintiff's facts that his requests to use the toilet were directed to, and denied, by Corporal Johnson, Officer

Morse, and arguably the Sergeant on duty.  However, Plaintiff fails to name any of
these three individuals as parties to this action.  And while *pro se* pleadings are
construed liberally by the Court, "this does not give a court license to serve as *de facto*
counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an
action." *McMahon v. Cleveland Clinic Found. Police Dep't*, 455 F. App'x 874, 877 (11th Cir.
2011) (per curiam)(unpublished); *see also Galloway v. GA Tech. Auth.*, 182 F. App'x 877,
883 (11th Cir. 2006) (per curiam) (unpublished) (alteration in original) (citations and
internal marks omitted) ("Although [*p*]*ro se* pleadings are held to a less stringent
standard than pleadings drafted by attorneys and are liberally construed, *pro se* litigants
still must comply with the procedural rules governing the proper form of pleadings.").
Plaintiff fails to connect Defendants Aldrete and McNeal to any complained-of act
regarding the denial of his request to use the toilet.  Therefore, based on Plaintiff's
pleadings, he cannot prove deliberate indifference on the part of Defendants Aldrete
and McNeal because they were not present during the complained of incident.  This
deficiency in Plaintiff's pleading makes it impossible that a jury could find for Plaintiff
on this issue.

    Assuming *arguendo* that Plaintiff had correctly identified Corporal Johnson and
Officer Morse as defendants in this action, his claim would also fail.  There is no
evidence that Corporal Johnson or Officer Morse *knew* that denying Plaintiff's request to
use the toilet at that time would substantially risk Plaintiff's health or safety.  While
embarrassing and uncomfortable, a single incident of urinating on oneself does not pose
a substantial risk to one's health or safety.  Moreover, Corporal Johnson allowed
Plaintiff to shower immediately after he urinated on himself and provided him with a
change of clean clothing, denoting that the officers were not denying Plaintiff's use of

the toilet to punish him – much less to cause him harm, pain, or injury.  Rather, Plaintiff's own submission is that the officers on duty had not received authorization to allow Plaintiff to be released from the chair.  The evidence presented by defendants is that inmates are released every two to four hours. (Doc. 34-3 at 5).  Therefore, the officers' conduct can only be described as possible negligence as they were not deliberately indifferent to Plaintiff's need.  *Estelle*, 429 U.S. at 106, 97 S. Ct. 285 (establishing that "deliberate indifference" entails more than mere negligence); *see also Farmer*, 511 U.S. at 835, 114 S. Ct. 1970.  Plaintiff has failed to satisfy the needed objective and subjective elements to prove a claim against the officers on duty or Defendants Aldrete and McNeal; therefore, summary judgment is appropriate in favor of these Defendants on this claim.

### Claim 4:        No violation for failure to train or supervise.

Plaintiff claims Defendants Mack and Byrne are responsible as supervisors for instituting the policies and customs at BCSCC that allow for unconstitutional acts and violations to occur.  (Doc. 1 at 15-19).  To state a successful claim, Plaintiff must establish a causal connection between each defendant's actions, orders, customs, policies, or breaches of statutory duty and the alleged deprivation of his constitutional rights.  *See Frankum v. Chapman*, 2009 WL 1118875, *3 (S.D. Ala. 2009); *Trotter v. Correctional Medical Services, Inc.*, 2008 WL 2225696, *9 (S.D. Ala. 2008).  Liability for an alleged constitutional violation cannot be established on the basis of a theory of *respondeat superior*.  *See Edwards v. Alabama Dep't of Corrs.*, 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A theory of *respondeat superior* is not sufficient to support their § 1983 claim. . . .").  "[S]upervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal

53

connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

"The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" *Id.* (citations omitted). "Alternatively, the causal connection may be established when a supervisor's 'custom or policy . . . result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Id.* (citations and internal quotation marks omitted).  In such instances, Plaintiff must show that the policy or custom was "the 'moving force [behind] the constitutional violation.'" *Pinkney v. Davis*, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) (citations omitted).  "[I]t is clear that not only must there be some degree of 'fault' on the part of [defendant] in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation." *Id.* (citations omitted).

a.     No failure to protect on March 10, 2012.

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' " *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)). "For a claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with " 'deliberate indifference' to inmate health or safety.' " *Id.* The

54

Supreme Court left open the point at which a risk of inmate assault becomes sufficient for Eighth Amendment purposes. *Id*. at n. 3. However, the Supreme Court held that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.  Furthermore, the Eighth Amendment is not violated by the negligent failure to protect inmates from violence; the plaintiff must show that the defendants knew of the risk and consciously disregarded it. *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986); *Moore v. Winebrenner*, 927 F.2d 1312 (4th Cir.1991).

Plaintiff alleges Defendants are liable for his dual attacks by inmates on March 10, 2012, due to the lack of cameras and monitoring of cellblocks.  Plaintiff's claim fails for four reasons.  First, Plaintiff fails to prove that Defendants knew of an actual risk of harm to him.  Plaintiff admits that he did not list Inmates Jones and Betts as enemies when he entered the jail.  (Doc. 65 at 9).  Additionally, Plaintiff fails to claim that he was aware of a threat or risk of harm prior to being attacked, or, more importantly for this action, that he notified an officer at BCCC of a risk of harm to him prior to March 10, 2012.  Second, Plaintiff fails to show Defendants disregarded any known risk to Plaintiff that ultimately resulted in harm.  Third, Plaintiff fails to show evidence of any actual injury suffered, as Plaintiff received medical treatment for only minor scrapes, swelling, and bruises following the incident.  Lastly, Plaintiff has failed to show how more monitoring would have prevented the attack.  Plaintiff states that the first attack occurred in front of the pod station where officers observe multiple areas at once.  (*Id*.).

Therefore, video cameras would not have prevented the attack.  The fact that no officer was available to view the altercation is negligence at worst.  There is no evidence in the record that anyone, not even Plaintiff, was aware of the potential March 10, 2012 attacks.

It is also a well-established principal that deference is due to correction facilities in the establishment of policies reasonably related to legitimate penological or governmental objectives.  *Bell v. Wolfish*, 441 U.S. 520 (1979); *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974); *Cruz v. Beto*, 405 U.S. 319, 321 (1972).  Sheriffs have full responsibility for daily management of the jails, including inmate supervision.  *Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1291 (11th Cir. 1998).  While the lack of video monitoring may present a cognizable constitutional claim, it fails to do so here as Plaintiff cannot show how the Defendants lack of video equipment in Plaintiff's cell caused his injury.[28]  *See Alabama Power Co. v. Dunaway*, 502 So.2d 726, 730 (Ala. 1987).  Therefore, Plaintiff fails to state a valid claim against Defendants.

> b.    No failure to protect on April 13, 2012.

Plaintiff alleges that Defendants are liable for having policies in place that allow for excessive force to be used on innocent inmates during the forceful extraction of their cellmates.  If no jury could find that that excessive force was used on Plaintiff on April 13, 2012, during the forceful cell extraction, it reasons that no jury could find that Defendants Mack and Byrne are liable for policies and customs that encourage excessive force or for supervisory liability.  *Howell v. City of Lithonia*, 397 F. App'x 618,

---

[28]    Defendant Bryne states that there are "[a]pproximately 92 mounted video cameras . . . placed throughout the Corrections Center, and we are in the process of installing 23 additional cameras. The vast majority of the jail is visible through a video security camera. A camera is present in each cell block." (Doc. 34-4 at 7-8).  However, Plaintiff disputes that cameras were in place on March 10, 2012.  (Doc. 1 at 17).

621 (11th Cir. 2010) ("Because [the arresting officer] committed no constitutional violation, [the plaintiff] cannot show a basis on which to establish municipal liability against the [c]ity or supervisory liability against [the police chief]."); *Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007) ("We need not address the Appellant's claims of municipal or supervisory liability since we conclude that no constitutional violation occurred." (citations omitted)).  Therefore, summary judgment should be entered as to this claim.

> c.      No unconstitutional use of restraint chairs.

Defendants maintain restraint chairs are used when an inmate threatens physical harm to himself, the staff, or another inmate, never as punishment, which includes Plaintiff's situation. (See Doc. 34-3 describing the restraint chair policy).  Restrained inmates are released periodically to use the bathroom—every two to four hours—and to stretch their bodies—every hour and a half to two hours. (*Id*. at 5).  On the average an inmate will be in the restraint chair six to eight hours and will be released at the shift supervisor's discretion to return to his cell. (*Id*.).  Restraint chairs are placed in a hallway, next to the central control room, which is a heavily traveled area by jail staff and places an inmate under almost constant supervision of members of the jail staff. (*Id*. at 6).  The Court has considered Plaintiff's claims and has determined that the two uses of the restraint chair following his disobedient conduct were efforts to maintain or restore discipline and were not excessive uses of force.  Therefore, without an underlying constitutional violation for the use of the restraint chairs, Defendants cannot be found liable as supervisors.  *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) (granting summary judgment for a prison warden and a psychiatrist on § 1983 supervisory liability claims as there was no evidence of an underlying constitutional

violation by a mental health professional).

## IV. Conclusion.

Based upon the foregoing reasons, the undersigned recommends that summary judgment be granted in favor of Sheriff Huey Mack, Assistant Chief Deputy of Corrections Dale Byrne, Sergeant Melvin Bradley, Officer Anthony Brown, Officer David Aldrete, Officer John Rowell, Officer Kendrick McNeal, Officer Joshua Keers, and Officer Mark Boyington, that the plaintiff take nothing and that this action be dismissed in its entirety with prejudice.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(B); S.D. ALA. L.R.72.4.  The parties should note that under Eleventh Circuit precedent, "the failure to object limits the scope of [] appellate review to plain error review of the magistrate judge's *factual findings*." *Dupree v. Warden, Attorney Gen., State of Ala.*, 715 F.3d 1295, 1300 (11th Cir. 2011).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not

specific.

     **DONE** this 30th day of January 2015.

                 /s/WILLIAM E. CASSADY
                 UNITED STATES MAGISTRATE JUDGE